388 A.2d 472 (1978)
In the Matter of J. G. J.
Appeal of DISTRICT OF COLUMBIA.
No. 12248.
District of Columbia Court of Appeals.
Argued October 13, 1977.
Decided June 13, 1978.
*473 Dennis McDaniel, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Richard W. Barton, Deputy Corp. Counsel and Louis P. Robbins, Principal Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellant.
Robert P. Mosteller, Public Defender Service, for appellee. Silas J. Wasserstrom, Public Defender Service, Washington, D. C., also entered an appearance for appellee.
Earl J. Silbert, U. S. Atty., John A. Terry, and Peter E. George, Asst. U. S. Attys., Washington, D. C., filed an amicus curiae brief for the United States.
Before NEBEKER, YEAGLEY, and FERREN, Associate Judges.
PER CURIAM:
This is an interlocutory appeal from a decision by the trial court to suppress evidence it deemed the fruit of an illegal stop of appellee. We reverse, finding that the police officers had sufficient "specific and articulable facts" to warrant an investigative stop. Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We further find that the officers, after appellee's response to the stop, had probable cause to arrest.

I.
The significant facts are as follows: Two plainclothes policemen, Officers Barrow and Queens, on patrol at 7 p. m. on January 22, 1977, received a radio lookout for two black males wanted in connection with a recent robbery. One suspect was described as 16-17 years old, 5'6" to 5'7" in height, of average build, wearing a long black coat and dark pants, and armed with a sawed-off shotgun. The second, was described as 16-17 years old, 5'6" to 5'7" in height, wearing an "Army-type" jacket and dark pants.
No more than 15 minutes later, the officers observed two black males walking along about six blocks from the scene of the robbery. One of them appeared to be 16-17 years old, 5'8" in height, and wearing a waist-length black jacket. The other, appellee, was wearing an Army fatigue jacket. The officers stopped their car behind the two youths, and Officer Barrow got out. Officer Queens described the next events at the suppression hearing:
My partner exited the driver side of the vehicle which was close to the sidewalk where these two individuals were walking. He identified himself as a police officer by displaying his badge and his identification card. The suspects stopped. At that time, this defendant reached quickly, it looked like to me, under his coat and pulled out a shiny-looking object, and my partner yelled: Watch out, Gary! He's got a gun. And when he did this it [the apparent weapon] simultaneously came out in seconds and pointed at my partner andat which time, I fired one shot from my service revolver after statingin fact, yelling to the defendant: "Drop it! Police officer."
Appellee then dropped the "gun," which actually was a hypodermic syringe and some packages of preludin, ran down the street, and hid under a car, where he ultimately was arrested.[1]

II.
The trial court granted appellee's motion to suppress the syringe and the narcotics on the ground that the discrepancies between *474 the radio dispatch and the actual appearance of the appellee and his companion were so significant that the stopping of the two was unreasonable.
The first question is whether the officer's action in stopping appellee amounted to a "seizure," within the meaning of the Fourth Amendmentan intrusion of such a character and degree that it had to be justified by "specific and articulable facts which, taken together with rational inferences from those facts," led the officers "reasonably to conclude . . . that criminal activity [was] afoot." Terry v. Ohio, supra at 21, 30, 88 S.Ct. at 1880, 1884. We agree with the trial court's implicit finding that there was, and we so hold. Judge Nebeker, in his separate statement, observes that Terry did recognize a limited category of cases involving "personal intercourse between policemen and citizens," id. at 19 n. 16, 88 S.Ct. at 1879, which do not amount to "seizures" and accordingly do not trigger the need for a constitutional justification. We believe, however, that this category is narrowly circumscribed by Terry's further observation that a Fourth Amendment "seizure" occurs when liberty is restrained "by means of physical force or a show of authority." Id. at 19 n. 16, 88 S.Ct. at 1879 n. 16.[2] We cannot hold "plainly wrong," D.C.Code 1973, § 17-305, the trial court's implicit finding that a sufficient "show of authority" occurred when the officers stopped their car by the sidewalk where the youths were walking, and one officer exited, identified himself to the suspects as a policeman, and showed his badge and identification card.[3]
We do disagree, however, with the trial court's finding that the officers lacked articulable suspicion to execute such a Terry stop. The similarities between the radiorun description and the appearances of appellee and his companion, together with their proximity to the scene, justified the initial stop. We have never required precise correlation between a victim's description and the actual appearance of a suspect. See McMillan v. United States, D.C.App., 373 A.2d 912 (1977); Irby v. United States, D.C.App., 342 A.2d 33 (1975). On the basis of the record before us, the officers' response to the sighting of these individuals was reasonable. We hold that the trial court's finding to the contrary was "plainly wrong." D.C.Code 1973, § 17-305.
The officer's command, "Drop it!", in response to appellee's reaching into his pocket for what appeared to be a weapon was a reasonable response to the developing situation. If it were to be termed a "search," it was reasonable as either the functional equivalent of a Terry frisk based on articulable suspiciona protective measure to ensure that weapons were not used against the officers, Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); Terry v. Ohio, supra, 392 U.S. at 23-24, 88 S.Ct. 1868or as a full search based on probable cause (production of the apparent weapon) plus exigent circumstances. Coolidge v. New Hampshire, 403 U.S. 443, 474-75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Accordingly, the syringe and preludin packages were properly admissible into evidence.
Reversed.
*475 NEBEKER, Associate Judge, concurring:
My colleagues read this record to reveal a Fourth Amendment intrusion of the type recognized in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). While I agree with the holding that there were "specific and articulable facts" sufficient to warrant a Terry stop, I also believe the facts known to the police officers provided probable cause to arrest.[1] Nonetheless, my reading of the record leads me to conclude that the encounter prior to the display of an apparent weapon did not constitute an intrusion requiring constitutional justification.
Before appellee pulled what appeared to be a gun, the police officers had stopped their car behind appellee and his companion, stepped out and identified themselves. This street encounter does not amount to a "seizure," which was defined in Terry, supra at 16, 88 S.Ct. at 1877, as "whenever a police officer accosts an individual and restrains his freedom to walk away." Terry and its progeny[2] upheld temporary restraints in certain street encounters where "specific and articulable facts, taken with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21, 88 S.Ct. at 1880. Nevertheless, the Court recognized in Terry that some contacts between the police and private citizens are not within the purview of the Fourth Amendment:
Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.. . .
Id. at 19 n. 16, 88 S.Ct. at 1879 n. 16.
The fact these police officers identified themselves as they approached did not, as of the instant appellee drew something from his pocket in an apparently hostile manner, restrain the liberty of appellee. Had appellee in fact pulled a gun on the officers, I would think it obvious that his freedom was not restrained. It seems equally clear that his producing what later appeared to be a syringe was an unrestrained act, by a suspect who was not yet restrained in the sense that constitutional justification is necessary.[3]
Surely it is not the intent of the court to imply that had the syringe actually been a gun, and the officer been killed, that it would find that appellee, although restrained solely by virtue of a show of authority, utilized only "residual liberty"[4] to shoot the officer and successfully escape. Terry's definition of a "seizure" requires restraint of the individual's "freedom to walk away," supra at 16, 88 S.Ct. 1868. Given that definition, it is impossible on these facts for a seizure to have occurred, and yet leave appellee the freedom to fire a weapon.
While it must be recognized that one should not measure events like these with stop-watch precision, Trilling v. United States, 104 U.S.App.D.C. 159, 179, 260 F.2d 677, 697 (1958) (Prettyman, J., concurring in part and dissenting in part), it seems to me unavoidable that we and the trial court must always look to whether the Fourth Amendment had yet come into play before a decision under it is made. That this entails some precision in time and event analysis is unavoidable.
*476 Appellee argues that whether a show of authority occurred here is a factual question, on which the trial court implicitly ruled. It is not clear to me that such a finding was the basis for the trial court's ruling that the "stop" was unreasonable. Moreover, if that were the case, I would think the ruling is without evidence to support it. See D.C.Code 1973, § 17-305(a). To equate the initial encounter here with a restraint of liberty occasioned by a show of authority would result in the elimination of all police-citizen contacts where the officers had no "specific and articulable" suspicions. This was not the intent of Terry, as Mr. Justice White recognized in his concurring opinion:
There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. Absent special circumstances, the person approached may not be detained or frisked but may refuse to cooperate and go on his way. . . .
Id. at 34, 88 S.Ct. at 1886.
The New York Court of Appeals has rejected the argument that a police officer's mere questioning of a person constitutes a show of authority. In People v. DeBour, 40 N.Y.2d 210, 217, 386 N.Y.S.2d 375, 381, 352 N.E.2d 562, 568 (1976), that court recognized the result of such an approach:
Were we to carry the defendant's interpretations of . . . the Constitution to their logical extreme we would have to conclude that when the police possess a need or desire to initiate an encounter with a private individual they must be prepared to seize him or else do nothing. This approach is hardly reasonable.
Accord, Commonwealth v. Hall, 475 Pa. 482, 380 A.2d 1238 (1977); State v. Foster, 237 S.E.2d 589 (S.C.1977).
This court previously has ruled that police officers may ask questions of individuals without necessarily infringing their Fourth Amendment rights, even though the police lacked the specific and articulable facts and the rational inferences therefrom which would reasonably warrant a Terry stop. See United States v. Burrell, D.C.App., 286 A.2d 845 (1972); United States v. Lee, D.C. App., 271 A.2d 566 (1970); and Thompkins v. United States, D.C.App., 251 A.2d 636 (1969). To rule otherwise would unreasonably escalate a police officer's initial contact with a citizen, still free to flee[5] or to do violence, into one requiring justification under the Fourth Amendment before the protections of that writ have been infringed. See United States v. Lee, supra.
The Fourth Amendment protection against unreasonable seizures does not require the police to justify as an intrusion on liberty or privacy their approach to a person on the street before that person is subject to restraint through a show of authority. The immediate reach for and display of an apparent weapon is the antithesis of such subjugation.
NOTES
[1] Appellee was charged with possession of a dangerous drug, D.C.Code 1973, § 33-702(a), and possession of narcotics paraphernalia, D.C. Code 1973, § 22-3601.
[2] See United States v. Burrell, D.C.App., 286 A.2d 845 (1972) (Gallagher, J., dissenting) for a thoughtful explanation of the perils of expanding the category of police activities deemed not to impinge upon interests protected by the Fourth Amendment.
[3] Contrary to the implication of Judge Nebeker's statement, a Fourth Amendment "seizure" does not turn on whether a suspect is totally restrained, i. e., prevented from fleeing or from reaching for a weapon or contraband. Indeed, many suspects who are "seized," within the meaning of the Fourth Amendment "show of authority" criterion, retain significant freedom of action. Evidence of such residual liberty cannot cancel the fact that an official restraint has been imposed amounting to constitutional encroachment. Thus, appellee's reaching for a syringe does not suggest the lack of a stop in this case. To the contrary, it was a direct response to official conducta "show of authority" constituting a stop. The police action here is wholly at odds with the casual police inquiry considered in Terry to be outside Fourth Amendment protection.
[1] See Carey v. United States, D.C.App., 377 A.2d 40 (1977).
[2] See United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).
[3] While we cannot know from this record what appellee intended by his actions, one might assume that his intent may have been to abandon the contraband in anticipation of a search. Evidence abandoned in response to an illegal arrest properly should be suppressed. Williams v. United States, 99 U.S.App.D.C. 161, 237 F.2d 789 (1956). However, that was not the situation here. Appellee was not yet restrained in the constitutional sense at the time he produced the syringe.
[4] Ante at 474, n. 3.
[5] Edwards v. United States, D.C.App., 379 A.2d 976 (1977).