Tracy PINKNEY, Appellant

v.

UNITED STATES, Appellee.

No. 98–CF–131, 01–CO–899.

District of Columbia Court of Appeals.

Argued May 28, 2003.

Decided June 17, 2004.

Thomas D. Engle, appointed by the court, with whom Sharon L. Burka was on the brief, for appellant.

David P. Cora, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Roy W. McLeese, III, and Teresa A. Howie, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, SCHWELB, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Appellant was charged with first-degree premeditated murder while armed, first-degree felony murder while armed, conspiracy to commit robbery, attempted robbery, two counts of assault with a dangerous weapon (ADW), and two firearms offenses. Before trial, the government dismissed the conspiracy charge, and at the close of the government's case, the trial court granted appellant's motion for judgment of acquittal on the charges of armed robbery and felony murder. The jury found appellant guilty of ADW and second-degree murder while armed, as a lesser included offense of the remaining first-degree murder charge, but acquitted him on all the remaining counts of the indictment. The court later sentenced appellant to consecutive prison terms of twenty years to life for murder and forty months to ten years for ADW.

Shortly after filing a notice of appeal from his conviction, appellant also filed a *pro se* motion to vacate his sentence pursuant to D.C.Code 23–110 (2001), asserting that his trial counsel had rendered ineffective assistance. That motion was denied without a hearing, and appellant noted an appeal from that denial, which we consolidated with the previous appeal.

Appellant argues that the trial court (1) abused its discretion in disqualifying his retained defense counsel of choice because

of counsel's previous and concurrent representation of a potential government witness; (2) abused its discretion in refusing to reinstate defense counsel once it was learned that the potential witness was not in fact on the government's list of witnesses; (3) erred in denying his motion to suppress an ammunition clip found in the pocket of his jacket; and (4) erred in denying his § 23–110 motion. We reject the first, third, and fourth arguments, but find merit in the second. Specifically, we find no error in the trial court's denial of the motion to suppress, no error in the denial of the § 23–110 motion, and no abuse of discretion in the court's original decision to disqualify defense counsel. However, we hold that the court abused its discretion a year later by failing to conduct a sufficient inquiry before ruling that appellant's counsel of choice would not be reinstated. For that reason we remand for further proceedings, as set forth in part III of this opinion.

## I. BACKGROUND

On April 2, 1996, Tory Brown, Philip Baldwin, and a man identified only as "Tim" were conversing in the 4600 block of A Street, S.E., when appellant, wearing a black three-quarter-length jacket and a black hat, approached them and asked if they knew a person named "Kebo." The three men said they did not, and appellant walked away. A few minutes later, however, appellant returned and repeated his question; the men again replied in the negative. Shortly after this encounter, police officers told the three men to "take a

walk" because of complaints about drug sales in the area. The men walked up A Street to the corner of 47th Street, and appellant approached them once again, this time accompanied by another man, Darrell Curry.[1] Both appellant and Curry pulled out handguns and ordered the three men to lie down. Mr. Baldwin complied, but Tory Brown and Tim ran down the hill, hearing gunshots as they ran. Within less than a minute, Brown found one of the officers who had told them to leave the area and asked him to "go up the hill" because he thought Baldwin had been shot, as in fact he had.

Kevin Hallman was repairing his car in front of his home in the 4900 block of Astor Place when he heard five or six gunshots coming from the vicinity of 47th Street. Seconds later, he saw appellant, wearing a long black coat, and another man (Curry), wearing a multi-colored athletic jacket, running up Astor Place toward him and away from the direction of the shots. Mr. Hallman approached the police officers now standing over Mr. Baldwin's body, one of whom was Officer Nabinett.[2] He and Officer Nabinett drove back up Astor Place, and within about seven minutes Hallman pointed out appellant and Curry as they walked through a parking lot in the 5000 block of Astor Place. Officer Nabinett radioed a description of appellant and Curry, stating that one of them was wearing a black jacket and blue jeans and that the other was wearing a blue and gold Notre Dame jacket.[3]

Menawhile, Officer Michael Campbell of the Metropolitan Police heard Officer Na-

1. Curry and appellant were jointly indicted, but Curry's case was severed before trial, and appellant was tried alone.

2. Officer Nabinett did not testify, and the record does not reveal his first name.

3. In addition to Mr. Hallman, several other witnesses testified about the events surrounding the shooting of Philip Baldwin. One of them, Reginald Robinson, said he actually saw both appellant and Curry point and fire their guns at Baldwin, who was lying face down on the ground. The two gunmen then ran uphill toward 49th Street.

binett broadcast a lookout about the shooting that had just occurred at 47th and A Streets, S.E. As Officer Campbell turned onto Astor Place, he spotted the man wearing the described blue and gold jacket running behind 5054 Astor Place. Running with him was a man later identified as appellant. Officer Campbell left his scout car and went around to the back of 5054 Astor Place to intercept them. As the two men came around the building, Officer Campbell pointed his service revolver at them and ordered them to "freeze," put their hands in the air, and lie on the ground.

After backup officers arrived, both appellant and Curry were handcuffed and patted down for weapons. This frisk occurred within five minutes of Officer Nabinett's lookout. Officer Campbell testified that the two men were not under arrest at this point, but were merely being held while the police continued their investigation. As appellant was about to be transported to a showup, Officer Campbell started to pat him down once again. He felt an object in appellant's right jacket pocket and removed it, discovering as he did so that it was a loaded ammunition clip for an automatic pistol. Appellant said, "Where did you get that from?" At trial another police officer testified that he found a loaded nine-millimeter Luger semi-automatic pistol lying on some leaves behind a house in the 5000 block of A Street. It was also established that the

ammunition clip recovered from appellant's pocket was operable in that pistol.

## II. THE DISQUALIFICATION OF DEFENSE COUNSEL

Ten days after he was indicted, appellant retained an attorney, Douglas Wood, to represent him. In October 1996, approximately one year before trial, the government moved to disqualify Mr. Wood because of his "successive representation" of a potential government witness, David Henderson, who supposedly would testify that appellant had made a jailhouse confession of the murder.[4] Mr. Wood had previously represented Mr. Henderson in an unrelated criminal matter, and at the time the government filed its motion, Mr. Wood was representing him in a case in the United States District Court that was scheduled for sentencing, as well as an upcoming trial in the Superior Court.

At the hearing on the motion to disqualify, the government asserted that Mr. Wood's representation of Mr. Henderson posed two conflicts. First, it argued that Mr. Wood's "ethical obligations to Pinkney will clearly hinder his ability to negotiate for the witness any cooperation agreement with the United States ...." Second, it maintained that Mr. Wood's "ethical obligations to the witness will clearly hinder his cross-examination of the witness" at trial. Mr. Wood responded by first informing the court that he had already moved to withdraw from his current repre-

---

4. According to the government's proffer, part of which was made *ex parte*, this jailhouse confession occurred when Mr. Henderson was brought back from federal prison to stand trial in a pending Superior Court case. Mr. Henderson claimed to have met a man in jail who said he had hired appellant to kill Philip Baldwin for a stated sum of money, but that appellant had "botched the whole thing up and got caught." Some time later, when Henderson, again in jail, saw appellant—

whom he knew from having grown up in the same neighborhood—appellant admitted "that indeed he had killed [Baldwin]." The government "did not have enough information to pursue an indictment" against the man who supposedly procured the killing, but it had a "strong case" against appellant, including not only his admission of the murder, but also an incriminating letter that appellant had written to Henderson.

sentation of Mr. Henderson. He then proposed that the court appoint counsel for Henderson and hold an *in camera* hearing (1) to determine what Mr. Henderson's testimony would be, (2) to assess his credibility, (3) to determine whether Mr. Wood could effectively cross-examine him without addressing Mr. Wood's prior representation of him, and (4) to find out whether Mr. Henderson would waive any objection to Mr. Wood's disclosure of prior confidences. Mr. Wood also stated that he would rely only on information that was a matter of public record to impeach Mr. Henderson on cross-examination.

About ten days later, after hearing further argument, the court granted the government's motion to disqualify Mr. Wood, stating:

> I frankly find, after reviewing all the relevant factors, that justice does require Mr. Wood's withdrawal and giving Mr. Pinkney an opportunity to choose new counsel. The reason I see that as necessary, recognizing that Mr. Pinkney does have a Sixth Amendment right to counsel of his choice, recognizing also that Mr. Pinkney has a right to conflict-free representation and to have vigorous representation without restraints on [Mr. Wood's] ability to do a thorough and effective cross-examination of a witness called against him. Recognizing also that Mr. Wood's former client has a right not to have any of his confidences exposed.

> And based on the proffers made at the last hearing, I understand that Mr. Pinkney is at least willing to consider a waiver of any conflict that might interfere with his right but obviously to determine whether a waiver is appropriate would want to know with some precision exactly what the witness' testimony would cover to have a realistic understanding of what kind of cross-examination would be necessary.

> It is also clear that Mr. Wood at least thought there was a possibility . . . based on his relationship previously with the witness, that the witness might be willing to waive some of the confidences that could possibly be at issue.

> The court's concern, however, [is] that a knowing and intelligent waiver by either Mr. Pinkney or the witness is impossible. On Mr. Pinkney's side, the government is under no obligation to disclose pretrial the exact nature of the witness' testimony, and Mr. Pinkney can't know what he's waiving if he doesn't know what the testimony is going to be.

> The witness, on the other hand, the only way he could agree to have Mr. Wood free to take advantage of his knowledge of him in cross-examination would be if Mr. Wood not only knew what the testimony was going to be about, and therefore was able to decide in advance what kinds of things would be used in cross-examination, and that very disclosure . . . would not only . . . require the government to disclose something they don't have to disclose, but it would . . . emasculate any cross-examination if you told the witness in advance what you'll be using, and that would clearly be unfair to Mr. Pinkney . . . .

A new attorney later entered an appearance for appellant. After that attorney and two successors were allowed to withdraw for various reasons, a sixth attorney (Wood had been the second) entered the case and represented appellant through the trial and the sentencing.

Before this court appellant argues that there was an insufficient record to enable the trial court to determine whether the government's assertions about Mr.

Henderson's allegations were valid. Specifically, he faults the court for basing its decision solely on Mr. Henderson's "unsworn hearsay assertion proffered by the prosecutor ... against appellant's in-court assertion that he had never discussed this case with Mr. Henderson" without taking counsel up on his request for an *in camera* hearing so that the court could make a credibility assessment. Thus, argues appellant, the trial court acted arbitrarily.[5] We disagree.

 "To protect [a defendant's] right to conflict-free counsel, the trial court has an affirmative 'duty to inquire' into the effectiveness of counsel whenever 'the *possibility* of a conflict' becomes apparent before or during trial." *Douglas v. United States,* 488 A.2d 121, 136 (D.C.1985) (citing *Wood v. Georgia,* 450 U.S. 261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (emphasis in *Wood* )); *see also Singley v. United States,* 548 A.2d 780, 784 (D.C.1988). Putting aside for now the issue of whether the disqualification of Mr. Wood was an abuse of discretion, we are satisfied that the court's decision was, at the very least, not arbitrary. On the contrary, the court held two hearings on the matter and allowed counsel for both parties to articulate their arguments fully. Moreover, even though the court did not indulge Mr. Wood's request to hold an *in camera* hearing,[6] it did listen to a lengthy proffer by the government, albeit *ex parte,* on what Mr. Henderson would testify about and how he obtained his information. In that proffer,

the government set forth several details of the crime that Mr. Henderson would have had no way of knowing (because he was incarcerated at the time of the shooting) unless he did in fact discuss the incident with appellant. On this record we are satisfied that the trial court did not act arbitrarily.

Appellant's main challenge to the disqualification of Mr. Wood raises a more complex issue. He argues that even if Mr. Henderson's allegations (presented through the government's proffer) were found somewhat credible, and therefore not simply a ploy by the government to have Mr. Wood disqualified, Mr. Wood's previous representation of Mr. Henderson still did not pose an actual conflict or a serious potential for conflict. We cannot agree.

 "The Sixth Amendment guarantees the accused in a criminal case the right to the effective assistance of counsel for his or her defense." *Gibson v. United States,* 632 A.2d 1155, 1158 (D.C.1993) (citations omitted). Ordinarily, "the deprivation of [a defendant's] counsel of choice would entitle [the defendant] to a reversal of his conviction as a matter of constitutional right." *United States v. Childress,* 313 U.S.App. D.C. 133, 176, 58 F.3d 693, 736 (1995) (citation omitted). However, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to

---

**5.** The advantage of a holding that the court's removal of Mr. Wood was arbitrary, rather than merely an abuse of discretion, is that it would allow this court to reverse appellant's conviction without having to inquire into whether it resulted in any prejudice to appellant. *See generally Harling v. United States,* 387 A.2d 1101, 1106 (D.C.1978); *see also United States v. Mays,* 69 F.3d 116, 121 (6th Cir.1995) ("evidence that a defendant was denied his right to retained counsel arbitrarily

and without adequate reasons is sufficient to mandate a reversal without a showing of prejudice").

**6.** While an *in camera* hearing of the type Mr. Wood suggested "may be advisable in some cases, we do not believe that such hearings are constitutionally required in all cases." *United States v. O'Malley,* 786 F.2d 786, 793 (7th Cir.1986).

guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States,* 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). The right to counsel of one's choice is therefore "circumscribed in several important respects," *id.,* such as when "a serious potential for conflict" arises. *Id.* at 164. When that occurs, the trial court has discretionary authority to disqualify counsel. *See id.* (the "presumption in favor of [a defendant's] counsel of choice ... may be overcome ... by a showing of a serious potential for conflict").[7]

■ "An actual conflict in successive representation may arise where the subject matter of the previous representation is *substantially related* to the case being tried, the attorney reveals privileged communications of the former client stemming from the previous representation, or the attorney's loyalties are otherwise divided." *Veney v. United States,* 738 A.2d 1185, 1193 (D.C.1999) (citations omitted; emphasis added); *see United States v. Casiano,* 929 F.2d 1046, 1052 (5th Cir.1991) ("an attorney operates under an 'actual conflict' when he represents a criminal defendant after having previously represented a government witness *in a related matter*" (citation omitted; emphasis added)). This

court has never articulated a test by which a trial court may determine whether a potential conflict reaches the point at which disqualification is warranted. However, the Seventh Circuit has said that the trial court should evaluate "the interests of the defendant, the government, the witness and the public in view of the circumstances of each particular case." *United States v. O'Malley, supra* note 6, 786 F.2d at 790 (citations omitted). Under this analysis, the trial court should "examine whether the subject matter of the first representation is substantially related to that of the second," whether "the conflict could cause the defense attorney improperly to use privileged communications in cross-examination," and whether "the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client ...." *United States v. Ross, supra* note 7, 33 F.3d at 1523 (citations omitted).

■ This raises the question of what it means for a previous representation to be "substantially related" to a current one. It is clear that Mr. Wood's representation of Mr. Henderson was not substantially related to the subject matter of appellant's trial—*i.e.,* the facts surrounding the killing of Mr. Baldwin.[8] However, the trial court

7. *See also United States v. Ross,* 33 F.3d 1507, 1523 (11th Cir.1994) ("The need for fair, efficient, and orderly administration of justice overcomes the right to counsel of choice where an attorney has an actual conflict of interest, such as when he has previously represented a person who will be called as a witness against a current client at a criminal trial" (citation omitted)); *United States v. Moscony,* 927 F.2d 742, 750 (3d Cir.1991) ("Thus, not only when an actual conflict is found, but when there is a showing of a serious potential for conflict ... the presumption in favor of a defendant's counsel of choice is overcome and the trial court may disqualify counsel" (citation and internal quo-

tation marks omitted)); *United States v. Ostrer,* 597 F.2d 337, 339–340 (2d Cir.1979) ("disqualification motions should be granted where the attorney in question is *potentially* in a position to use privileged information obtained during prior representation of [the witness]" (emphasis added)).

8. For examples of representations which did involve "substantially related" subject matter, *see United States v. Lanoue,* 137 F.3d 656, 663 (1st Cir.1998) (witness for the government was a co-defendant whom defense counsel had represented during the first trial on related charges); *Mays,* 69 F.3d at 121 (defense counsel had represented seven government

raised a very important point: because appellant's defense would necessarily involve refuting Mr. Henderson's testimony, it would consist mostly of attacking his credibility on cross-examination. This situation is very similar to that presented in *United States v. James*, 708 F.2d 40 (2d Cir.1983), in which the Second Circuit observed that the danger in not protecting the former client's confidences could be "highlighted by the nature of the questioning that can be anticipated." *Id.* at 45. Following that rationale, the Seventh Circuit noted in *O'Malley* that the credibility of the government witness, whom defense counsel had previously represented, was likely to be critical at trial. "Because this impeachment could be accomplished by eliciting specific instances of misconduct involving matters of truthfulness, and because the trial court found that it was likely that [defense counsel] gained knowledge of such instances involving [the witness] through their attorney-client relationship, the trial court found that [defense counsel's] prior representation of [the witness] was relevant to 'the issues and determinations presented in the instant case.'" *O'Malley*, 786 F.2d at 792 (citation omitted). The Seventh Circuit's reasoning in *O'Malley* reflects that of the trial court here. That is, because impeachment of Mr. Henderson would be an important part of the defense, issues concerning Henderson's credibility were therefore "substantially related" to Mr. Wood's representation of appellant. We think the approach taken by the Second and Seventh Circuits is sound, and thus we conclude that the court did not abuse its discretion in disqualifying Mr. Wood.[9]

The fact that appellant waived his right to conflict-free representation does not persuade us otherwise. Appellant faults the trial court for creating a bright-line rule that, in order for a waiver to be "knowing and intelligent," the defendant must know the exact nature of the witness' testimony. This standard, he contends, is impossible to meet because a criminal defendant can never know the exact nature of a government witness' testimony before the witness takes the stand.

■■■ "The right to conflict-free representation, like other constitutional rights, may be waived by a defendant who wishes to be represented by a particular attorney, though that attorney is burdened by a conflict of interest." *Fitzgerald v. United States*, 530 A.2d 1129, 1134 (D.C.1987) (citations omitted). However, "[a]s with the relinquishment of other important constitutional rights, waivers of conflict-free counsel must be 'knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences.'" *Douglas*, 488 A.2d at 138 (citation omitted). Therefore,

before a waiver is accepted, the trial court should conduct, on the record, an inquiry sufficient to establish that the

---

witnesses during grand jury investigations); *Moscony*, 927 F.2d at 747 (during grand jury investigation, defense counsel also represented several government witnesses who were employees of the defendant); *United States v. James*, 708 F.2d 40, 46 (2d Cir.1983) (defense counsel had previously represented a person who was both a witness and an informant for the government); *United States v. Provenzano*, 620 F.2d 985, 1004 (3d Cir.1980) (defense counsel had previously represented the government's chief witness, who worked for the defendant in a RICO enterprise, at that witness' murder trial).

9. On the other hand, we cannot say that a refusal to disqualify Mr. Wood would have been an abuse of discretion, given the closeness of this case. *See Wheat*, 486 U.S. at 164, 108 S.Ct. 1692 ("Other district courts might have reached differing or opposite conclusions with equal justification, but that does not mean that one conclusion was 'right' and the other 'wrong'").

defendant is aware of the right to conflict-free representation; understands the nature of the risks and the potential adverse effects of foregoing that right; and knows that, if convicted, he or she will not be able to complain on appeal that the defense at trial was compromised by the conflict.

*Id.* (citations omitted). The Supreme Court also made this clear in *Wheat,* holding that trial judges "must be allowed substantial latitude in refusing waivers of conflicts of interest . . . ." 486 U.S. at 163, 108 S.Ct. 1692. In coming to this conclusion, the Court declared that the best interest of the defendant was not the only factor at stake:

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. . . . Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

*Id.* at 160, 108 S.Ct. 1692; *see also Moscony,* 927 F.2d at 749 ("Such a waiver, however, does not necessarily resolve the matter, for the trial court has an institutional interest in protecting the truth-seeking function of the proceedings").

Bearing in mind that the trial court has "substantial latitude" in dealing with these issues, we are not willing to say that the court in this case abused its discretion in refusing appellant's waiver. While we do not foreclose the possibility of an attorney's cross-examining a former client, the appearance of impropriety was too great under the circumstances presented here, and appellant simply had no way of knowing exactly what valuable information he might have been required to refrain from placing before the jury. The trial court's decision was bolstered by the fact that Mr. Wood, who surely learned confidential information during his representations of Mr. Henderson,[10] never came forward with a waiver from Mr. Henderson, whose rights were also entitled to protection.[11] Furthermore, we do not attach much significance to Mr. Wood's offer to keep his impeachment of Henderson limited to matters of public record. *See United States ex rel. Stewart v. Kelly,* 870 F.2d 854, 857 (2d Cir.1989) ("To limit cross-examination of the informant to his rap sheet may have prejudiced [the defendant], had more searching inquiries been necessary . . . . Alternatively, not to limit the cross-examination might have violated the rights of the informant, if, for impeachment purposes, competent cross-examination would

---

10. *See O'Malley,* 786 F.2d at 792 ("given the breadth of the charges in the theft case 'it is fair to infer and conclude' that [defense counsel] possessed information with potential impeachment value" gained through the representation); *Provenzano,* 620 F.2d at 1005 ("access to privileged information is conclusively presumed").

11. *But see James,* 708 F.2d at 46 ("Only the client and the attorney know what confidential communications occurred. To the extent that . . . the client is sufficiently unconcerned about such questioning that he does not join in the motion to disqualify . . . the interest of the government in disqualifying the attorney

is normally quite weak."); *United States v. Cunningham,* 672 F.2d 1064, 1072 (2d Cir. 1982) ("The refusal to disqualify in the absence of a motion by the former client is all the more appropriate in the context of a criminal prosecution with its implication of constitutional rights"). It is also significant that Mr. Wood withdrew from his current representation of Mr. Henderson, who presumably would be provided with new counsel. Thus it could no longer be argued that Mr. Henderson was at risk of receiving inadequate legal advice in his ongoing criminal matters on how to take advantage of his cooperation with the government.

delve into matters not contained in the rap sheet").[12]

## III. THE DENIAL OF THE MOTION TO REINSTATE COUNSEL

Having held that the court's original disqualification of Mr. Wood was not an abuse of discretion, we now turn to the separate issue of whether the court abused its discretion in denying appellant's motion to reinstate Mr. Wood a year later.[13] That motion, if granted, would have necessitated a delay in the trial, since it was made on the first day of trial, after the *voir dire* had begun, and Mr. Wood had had no contact with the case for several months. The grant or denial of such a motion is, again, a matter within the trial court's discretion. *See Yancey v. United States,* 755 A.2d 421, 427 (D.C.2000). On the record before us, we conclude that the court abused its discretion and that the case must be remanded for further proceedings.

The trial began on a Thursday. During *voir dire* on Thursday morning, defense counsel learned that the government's witness list did not include Mr. Henderson. Immediately after lunch, he moved to stay the proceeding, strike his own appearance as counsel, and reinstate Mr. Wood as defense counsel. The prosecutor offered to tell the court why the government had kept Mr. Henderson off the list, but asked permission to do so *ex parte* because, "for security reasons," she did not wish to "endanger anyone." The court did not take the prosecutor up on that offer, remarking that Mr. Wood's status had "already been determined by a prior judge [and] that there was a conflict or a potential conflict, and that as a result Mr. Wood should not continue to represent Mr. Pinkney." The court then denied appellant's motion to stay the proceedings, commenting that "we are sort of in the middle of trial, and [defense counsel] is finally prepared and ready for trial." [14]

Appellant argues that the court abused its discretion because it had "an obligation to permit previously disqualified counsel to re-enter the case if it determined that the conflict no longer exist[ed]." We agree with appellant that, in ruling on the motion, the court abused its discretion. However, given the thin record before us on this issue, we are not prepared to say that the conflict no longer existed, or that the court should have reinstated Mr. Wood. Rather, for the reasons which follow, we base our decision on the trial court's failure to make any inquiry at all into these matters.

■ As we have explained, "[a] defendant has a constitutionally protected right to choose his own counsel, arising out of both the Sixth Amendment right to counsel and notions of due process under

---

**12.** As an alternative reason for disqualifying Mr. Wood, the government argued that there was a potential conflict resulting from Mr. Wood's role in securing a "benefactor payment" for another attorney, whom we shall call "Mr. G.," to represent Mr. Curry, appellant's co-defendant. The government proffered that it had in its possession a letter from appellant to Mr. Henderson describing how appellant, Mr. Curry, Mr. Wood, and Mr. G. had met to "strategize the best way to handle this case ... in an effort to keep Mr. Curry quiet and to try to beat the charge." The trial court, however, made no finding as to whether this benefactor payment gave rise to a potential conflict, nor did it address the likelihood that Mr. Wood might be called as a witness. We therefore do not consider this point on appeal.

**13.** In the intervening months, the case had been reassigned in the ordinary course to a different judge for trial.

**14.** Jury selection began on Thursday, but it had not been completed at the time the motion was made. The jury was not empaneled and sworn until the following Monday.

the Fifth Amendment." *Yancey,* 755 A.2d at 425. This right is not absolute, but "must be carefully balanced" against the public's "strong interest in the prompt, effective, and efficient administration of justice ...." *United States v. Burton,* 189 U.S.App. D.C. 327, 331, 584 F.2d 485, 489 (1978). In deciding whether to grant a continuance in order to permit the substitution of new counsel, the trial court must consider several factors: "(1) whether other continuances have been requested or granted; (2) the inconvenience to the litigants, witnesses, and the court; (3) whether the request is dilatory or contrived; (4) the degree to which the defendant contributed to the delay; (5) whether the defendant has attempted to arrange for competent additional counsel; (6) the degree of identifiable prejudice which would flow from the continuance; and (7) the complexity of the case." *Leak v. United States,* 757 A.2d 739, 744–745 (D.C.2000); *see also Yancey,* 755 A.2d at 428 (citing *Burton,* 189 U.S.App. D.C. at 332–333, 584 F.2d at 490–491). More generally, in deciding whether a trial court in any case has abused its discretion, the reviewing court should consider "whether the decision maker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979) (citation omitted). "A trial court need not explain its reasoning in detail, but rather need only 'perceive [these] salient factors' when exercising its discretion." *Leak,* 757 A.2d at 745 (citation and footnote omitted).

It is clear from the record that the trial court neither perceived nor considered these salient factors. The court denied appellant's motion mainly because the litigants were "sort of in the middle of trial" and because Mr. Wood's successor counsel was "finally prepared and ready for trial." In other words, "[i]t is not apparent that the trial court considered anything in this case other than the demands of the criminal docket." *Yancey,* 755 A.2d at 428. Such "insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality." *Burton,* 189 U.S.App. D.C. at 332, 584 F.2d at 490 (citation omitted). What we have here is more than just a simple failure by the court to consider a relevant factor. *See Johnson,* 398 A.2d at 365. The court here failed to engage in the proper analysis, as articulated in *Leak* and *Yancey,* and to inform itself adequately before ruling. We therefore have no choice but to conclude that the court abused its discretion. Our conclusion is bolstered by the fact that "[a]ppellant found himself in circumstances not of his own making," *Yancey,* 755 A.2d at 428, and asked for Mr. Wood's reinstatement as soon as possible after learning that Mr. Henderson was not going to testify as a government witness.[15]

The remaining question for us is to determine the proper remedy for this sort of abuse of discretion. The District of Columbia Circuit addressed this issue a few years ago in *Childress,* in which a defendant's attorney of choice was, as in this case, disqualified because of a potential

---

**15.** The trial court observed that Mr. Henderson could "conceivably" remain a potential witness for "rebuttal purposes." While this is not an unreasonable consideration, given the unpredictability of any trial, the government did not offer it as a reason; consequently, there is no indication whether this was a realistic concern. Indeed, it may be just as likely that Mr. Henderson would not have been called at all, given the "security reasons" alluded to by the government. On this record we simply do not know, and neither could the trial court.

conflict of interest. However, once the charges were divided into separate groups with each to be the subject of a separate trial, the potential conflict ceased to exist for one of the trials. The defendant then made known to the court that he wanted his chosen counsel reinstated, but his motion was denied. Because there was no longer a potential for conflict, the appellate court held that the trial court had erred in denying the motion. As to the remedy, the court observed that "the gap in the record [16] . . . leaves us without an adequate basis for determining whether and on what terms [defense counsel] would have re-entered the case . . . ." 313 U.S.App. D.C. at 175–176, 58 F.3d at 735–736. It therefore "remand[ed] the matter to the [trial] court for an inquiry into whether [counsel of choice] would have been willing and able to re-enter the case . . . ." *Id.* at 176, 58 F.3d at 736.

▇ The case before us is analogous to *Childress*, in that there is no indication in the record that Mr. Wood would have been willing and able to represent appellant when the trial actually took place. Although there are some differences between the two cases (for one thing, the chosen defense attorney in *Childress* died while the appeal was pending), we think they are sufficiently similar to warrant our following the course charted in *Childress*. That is to say:

> [W]e remand the matter to the [trial] court for an inquiry into whether [Mr. Wood] would have been willing and able to re-enter the case in [September 1997].
>
> If, after a hearing, the [trial] court concludes that [Mr. Wood] would have

re-entered the case . . . the [trial] court must vacate his murder and [ADW] convictions. . . . [But if], on remand, the [trial] court concludes that [Mr. Wood] would not have re-entered the case . . . we hold that [appellant] was not denied counsel of choice and that his murder and [ADW] convictions must stand.

*Childress,* 313 U.S.App. D.C. at 176, 58 F.3d at 736. We assume that the court will need to conduct some sort of evidentiary hearing, and we expect that the court will address, to the extent necessary, the several pertinent factors that we identified in *Leak,* 757 A.2d at 744–745. Beyond that, however, we leave the details of the remand proceedings to the discretion of the trial court. As in *Childress,* if the court concludes that Mr. Wood "would not have re-entered the case" when appellant moved to reinstate him as counsel, then the judgment of conviction shall stand affirmed. But if the court finds that Mr. Wood was willing and able to represent appellant after learning that Henderson would not be a witness, and if the court can be assured that there would be no risk that Henderson's rights would be infringed by Wood's renewed representation of appellant,[17] it shall vacate the judgment and order a new trial.

## IV. THE MOTION TO SUPPRESS

Since this case may be retried, the validity of appellant's arrest and search is still a live issue. Appellant argued below that he was arrested and searched without probable cause, and that Officer Campbell's subsequent *Terry* frisk [18] was unlawful because he did not believe that the object in appellant's jacket was a weapon. The trial

---

**16.** The transcript of a pertinent status hearing could not be prepared because the court reporter's notes had been lost.

**17.** *See Ross,* 33 F.3d at 1523; *O'Malley,* 786 F.2d at 790.

**18.** *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

court denied the motion to suppress, ruling that appellant was lawfully stopped, but not yet arrested, since there was a reasonable basis for Officer Campbell to believe that appellant was one of the two suspects mentioned in the lookout. With respect to the patdown of appellant, the court ruled as follows:

It does not seem to me under these circumstances that if [the officer] feels something and can't rule out that it's not a weapon, for safety purposes, it's appropriate to go into the pocket to determine simply whether it was a weapon or not. ... [B]ecause officers can't be in a position where they feel an object in someone's pocket, they don't know what it is and they're about to put somebody into a transport car.

We address each ruling in turn.

### A. The stop [19]

"On appeal from the denial of a motion to suppress evidence, the scope of this court's review is limited." *Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991). We defer to the trial court's findings of fact and will not disturb them unless they are clearly erroneous or without evidentiary support, *see Lawrence v. United States,* 566 A.2d 57, 60 (D.C.1989), but we review *de novo* whether the evidence establishes that there was a reasonable articulable suspicion. *See Brown,* 590 A.2d at 1020. ■ "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response." *Adams v.*

*Williams,* 407 U.S. 143, 145, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). "The police may briefly detain a person for an investigatory or *Terry* stop, even if they lack probable cause, if the officers have a reasonable suspicion based on specific and articulable facts that criminal activity may be occurring." *Flores v. United States,* 769 A.2d 126, 129 (D.C.2000) (citation omitted). Reasonable suspicion "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000); *accord, e.g., James v. United States,* 829 A.2d 963, 966 (D.C.2003) (citing *Brown,* 590 A.2d at 1014). In determining reasonableness, we consider the totality of the circumstances, *Flores,* 769 A.2d at 129, and "view the situation through the lens of a reasonable police officer, guided by his training and experience." *In re D.A.D.,* 763 A.2d 1152, 1156 (D.C.2000) (citation omitted).

■ Given the circumstances of this case, we are satisfied that Officer Campbell had a reasonable articulable suspicion to believe that appellant had just committed a crime. Moments before spotting appellant and his companion, Darrell Curry, Officer Campbell heard Officer Nabinett's broadcast about a shooting that occurred only a few blocks away. The fact that Campbell could not recall, at the moment he saw appellant and Curry, the description of appellant does not make his suspicion unreasonable. *See In re J.G.J.,* 388 A.2d 472, 474 (D.C.1978) ("We have never required precise correlation between a victim's description and the actual appearance of a suspect" (citations omitted)). The broadcast mentioned two men, one of

---

19. On appeal, appellant does not renew his argument that he was subjected to a full-fledged arrest rather than merely a *Terry* stop.

whom was wearing a very distinctive jacket. Upon seeing someone wearing such a jacket so soon after the shooting and in such close proximity to its site, it was not unreasonable for the officer to believe that his companion—appellant—was the second man implicated in the shooting. *See, e.g., District of Columbia v. M.M.,* 407 A.2d 698, 701 (D.C.1979) (stop was reasonable when suspects were "wearing jackets identical to or closely approximating" those described in the lookout, and were "only a mile away from the robbery about 25 minutes after it occurred"). Indeed, in similar circumstances we have held that police officers had not just reasonable suspicion but probable cause for an arrest. *See Hill v. United States,* 627 A.2d 975, 978 (D.C. 1993) ("[t]he particularized description transmitted to the arrest team, together with the fact that the arrest team found Hill at the exact location stated by Officer Graves, certainly gave them probable cause to make an arrest").

### B. *The protective search*

■ If an officer reasonably believes that the suspect is armed and dangerous, that officer may conduct a search for weapons sufficient in scope to protect the officers and others present. "This theme, the protection of the officer making the stop and of innocent bystanders, is of paramount importance." *United States v. Mason,* 450 A.2d 464, 466 (D.C.1982). Such a search, however, is a limited one, and should not go beyond what is necessary to determine whether the suspect is armed. *Sibron v. New York,* 392 U.S. 40, 65–66, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

■ During the frisk, Officer Campbell felt an object in the pocket of appellant's jacket. At first he testified that "in and of itself" it did not feel like a gun, knife, or other kind of weapon, but later clarified that he "didn't know whether or not it was a weapon." Officer Campbell then removed the object and discovered that it was an ammunition clip. The issue here is whether Officer Campbell lawfully removed the clip from appellant's pocket, or whether under *Terry* and its progeny he had no right to remove it because its identity as a weapon was not instantly apparent to him.

This court has yet to address this specific issue. However, in *United States v. Swann,* 149 F.3d 271 (4th Cir.1998), there was a very similar set of facts. In *Swann* an officer felt "something hard and unusual," which turned out to be a group of credit cards, in the suspect's sock. *Id.* at 272. Instead of testifying that he could immediately tell that the object was a weapon, the officer said that he did not know what it was. Characterizing the evidence as "entirely ambiguous" as to whether the officer suspected a weapon, *id.* at 275, the Fourth Circuit nevertheless rejected the exact argument made here by appellant and upheld the search. Its rationale was twofold. First, "[t]he purpose of a frisk is to allow an officer 'to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'" *Id.* at 275 (quoting *Terry v. Ohio,* 392 U.S. at 23, 88 S.Ct. 1868). Because the officer could not rule out the possibility that the object might be a weapon, he could not be assured that it was *not* a weapon. *Id.* Second, noting that it also had to determine whether a reasonable officer in such circumstances would have believed that the object could likely be a weapon, the court held that "[g]iven all the circumstances, it was objectively reasonable for the officer to believe that this particular hard object could likely be a weapon ...." *Swann,* 149 F.3d at 276.

We find the Fourth Circuit's rationale to be quite sound. Following it here, we hold

that Officer Campbell was justified in removing the object from the pocket of appellant's jacket. Upon frisking appellant, he was unable to discern immediately the nature of the object, and thus he could not be sure that it was not a weapon.[20] Moreover, Officer Campbell had just heard a broadcast about a shooting, and soon thereafter he saw two men, who matched the description of the shooters, in close proximity to the place where it occurred. Thus it was not unreasonable for him to believe that the object might have been a weapon, and he was entitled to take the precautionary step of removing it just to be safe.

Even assuming *arguendo* that the frisk exceeded its lawful scope, which it did not, the evidence would still have been admissible under the "inevitable discovery" doctrine. This doctrine "provides that ... the evidence still may be admitted '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *Hicks v. United States*, 730 A.2d 657, 659 (D.C.1999) (citing *Nix v. Williams*, 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)); *see also, e.g., McFerguson v. United States*, 770 A.2d 66, 75 (D.C.2001). Here appellant was not yet under arrest when the clip was found, but had only been stopped pursuant to *Terry*. An eyewitness to the crime was then brought to the place where appellant was being held and there identified him as one of the assailants. This identification, coupled with appellant's proximity to and flight from the crime scene, established probable cause to arrest, and the clip would have been inevitably discovered in the course of a search incident to such an arrest.

For these reasons we find no error in the denial of appellant's motion to suppress the ammunition clip.

## V. CLOSING ARGUMENT

In his closing argument, defense counsel maintained first and foremost that appellant was not at the scene of the crime, and that the identifications made by Tory Brown and Reginald Robinson were not convincing. He also asserted that Officer Campbell did not find the ammunition clip on appellant, but planted it on him. As an alternative contention, defense counsel offered the following:

> [W]as this a case where somebody had been killed and someone else snatched up his gun and the murder weapon? Those guns have value on the street, and is that what happened in this case? And if we say that that is potentially what happened, then doesn't everything ... fit? Would that explain why Pinkney ran from the police? Not because he committed a murder, but because he snatched a gun.... Isn't that why [appellant] wouldn't really be concerned about [a witness who did not hear or see the shooting, but saw appellant running] seeing him because as far as he knows he's just running away with a stolen gun ...?

After concluding his argument, defense counsel informed the court that appellant was "very upset" with him for offering this alternative explanation for having the clip in his possession and had not consented to

---

**20.** *Compare United States v. Adell,* 676 A.2d 446 (D.C.1996), in which we affirmed an order granting a motion to suppress a plastic bag containing cocaine, which an officer had seized from the defendant's pocket, because the officer knew—before he removed the bag from the pocket—that the bag was not a weapon. The officer "was not entitled under *Terry v. Ohio* to remove the plastic bag from the pocket once he realized that it was not a weapon and did not contain a weapon." *Id.* at 448.

it. Counsel added, however, that "with all respect for him, my judgment was to make that argument as an alternative argument." The court said it did not understand counsel's remarks to be any kind of acknowledgment of what happened, but merely a "possible scenario and nothing more." When appellant voiced his displeasure, the court responded, "If what you're asking for is a new trial, I don't believe a tactical disagreement with your lawyer about the appropriate arguments to make is a basis for me to declare a mistrial . . . ." The court also refused to instruct the jury to disregard that portion of counsel's argument.

After sentencing, appellant filed a § 23–110 motion arguing that counsel's "admission" during closing argument weakened his chance of being acquitted. The court denied the motion, stating that "[c]ounsel made a strategic decision to suggest an explanation of the [clip] that would not necessarily tie [appellant] to the shooting. . . . In light of all the evidence, trial counsel's tactical decision to argue [this in] closing . . . fell within the range of reasonable professional assistance." The court also concluded that appellant "has not [shown] and cannot show that he was prejudiced by any of his counsel's tactical decisions," which were "well within the range of reasonable strategic trial decisions that are not appropriately second-guessed on post-conviction review."[21] On appeal, appellant concedes that a lawyer is permitted to determine trial strategy, but asserts that defense counsel's argument was an

admission of guilt on the charge of carrying a pistol without a license (CPWL) rather than a tactical decision. Such an admission, argues appellant, was tantamount to not honoring his decision to plead "not guilty," a decision over which the client has the final say,[22] as well as a failure to "force the government to prove guilt on every count in the indictment."

 The trial court was plainly correct in its conclusion that defense counsel's comments were merely an alternative argument, not an admission of guilt. But even assuming that counsel's argument could be interpreted as an admission of guilt, appellant's claim of entitlement to a new trial would nonetheless fail for two reasons. First, the "admission" can only be read as affecting the CPWL charge, of which appellant was acquitted; hence any error (and we find none) would have been harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[23] Second, appellant offers no support for his present contention that the so-called admission of guilt on the CPWL charge would be grounds for reversal of his murder and ADW convictions. On the contrary, the most that counsel admitted, if anything, was that appellant was at the scene of the crime. Although appellant did not want counsel even to suggest that he was anywhere near that scene, this was a tactical decision for counsel to make, in the exercise of his professional judgment, since merely being at the scene is not itself a crime.[24] Nor can it be seriously argued

---

**21.** Appellant made additional claims of ineffective assistance in his § 23–110 motion (all of which the trial court rejected in a comprehensive sixteen-page order), but this is the only one he continues to raise on appeal.

**22.** *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

**23.** We assume, solely for convenience and without deciding the point, that the stringent reasonable doubt standard of *Chapman* applies here.

**24.** The cases cited by appellant are inapposite. In *State v. Carter*, 270 Kan. 426, 14 P.3d 1138 (2000), the defendant was charged alternatively with premeditated murder and felony

that placing appellant at the scene, where he may have opportunistically retrieved a gun off a dead body, was a stipulation "to facts which amount to the 'functional equivalent' of a guilty plea." *See Wiley v. Sowders*, 647 F.2d 642, 649 (6th Cir.1981) (citations omitted).

We therefore find no basis for reversal in the denial of appellant's § 23–110 motion.

## VI. CONCLUSION

We hold that the trial court did not err in denying appellant's motion to suppress, and we affirm the denial of his motion under D.C.Code § 23–110. However, because the trial court abused its discretion in failing to make a sufficient inquiry into whether appellant's counsel of choice should have been reinstated, we remand the case for further proceedings consistent with the decision of the United States Court of Appeals in *United States v. Childress*, as outlined in the last paragraph of part III of this opinion.

*Affirmed in part, remanded in part.*

murder. Defense counsel, instead of endorsing his client's claim of total innocence, "conceded Carter's involvement but denied that he premeditated the shooting of [the victim]." *Id.* at 429, 14 P.3d at 1141. In the instant case, while defense counsel's "admission" may have, against his wishes, placed appellant at the scene, it in no way admitted his involvement in the shooting. Likewise, in *State v. Anaya*, 134 N.H. 346, 592 A.2d 1142

(1991), counsel refused to argue his client's innocence at trial, as the defendant wished, but instead maintained only that the defendant was guilty of the lesser included offense of being an accomplice to second-degree murder. In the present case, however, "admitting" guilt of CPWL is not, in any way, an admission of guilt of any lesser included offense of murder.