476 So.2d 210 (1985)
Thomas Eugene DRAKE, Appellant,
v.
STATE of Florida, Appellee.
No. 84-1171.
District Court of Appeal of Florida, Second District.
July 26, 1985.
Rehearing Denied October 10, 1985.
J. Marion Moorman, Public Defender, and William H. Pasch, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Katherine V. Blanco, Asst. Atty. Gen., Tampa, for appellee.
GRIMES, Acting Chief Judge.
Appellant was charged with attempted second degree murder, aggravated battery and armed robbery with a deadly weapon, all the crimes being directed toward his wife, Nancy Drake. Following a jury trial, he was convicted of attempted second degree murder with a weapon and armed robbery with a deadly weapon. He was sentenced to consecutive terms of thirty years and life imprisonment. He now appeals his convictions.
The incident leading to appellant's conviction occurred on July 8, 1983, at the *211 First Nazarene Church of Winter Haven and involved the hitting of Nancy Drake over the head with a hammer. At the trial the following pertinent testimony was given.
Joseph Poston, Jr., the associate pastor, testified that Nancy, who worked at the church as a secretary, had collected about $600 in selling tickets for a church concert. She kept the money in a box that was in her desk drawer. Shortly before noon, he heard Nancy on the telephone requesting her husband to bring her some lunch. Poston left the church about 12:10 p.m. and returned at 12:47 p.m. A minute or two after he returned, Poston was told by some Toyota employees that someone was hurt in the church. He went inside and found Nancy lying unconscious in a pool of blood. He observed that Nancy's desk drawer had been opened and checks were lying around. After the ambulance left, Poston telephoned appellant about the incident. Poston said appellant sounded as if he had run to the telephone.
Pat Morgan, a radio disc jockey, testified that he called the church between 12:15 and 12:30 to discuss an advertisement. He talked with both appellant and Nancy, with whom he was acquainted. Pursuant to his practice, he taped the conversation and determined that it lasted almost nine minutes.
Althea Toth testified that she arrived at the church at approximately 12:25 p.m. to deliver a check to appellant, who was a part-time church employee. As she drove in, she noticed a cream-colored station wagon in the parking lot. She described the driver as "an older man with a slender face and white hair, close-cropped hair." Just before Toth left, Nancy came to the church door and spoke with her. Toth left the church at approximately 12:30 p.m. Appellant later told Toth that he had driven in just as she left. Appellant also volunteered to Toth the statement that his fingerprints would be on the hammer because he had used it to hang pictures for Nancy that morning.
Shirley Whitehead testified that she arrived at the church parking lot at 12:40 p.m. She heard someone moaning and subsequently found Nancy Drake lying on the floor by the safe in a room across from the sanctuary. She drove to a nearby Toyota dealer for help. A paramedic responded to the emergency call at 12:58 p.m. The ambulance left the scene with Nancy at 1:09 p.m.
Nancy Hutzell, a crime scene technician, testified that she found the church safe open and a hammer lying near Nancy's head. No fingerprints could be obtained from the hammer. A fingerprint found on a door window matched that of Ray Starr, a former mental patient. However, Starr was a church member and was known to be in the building at times. In the course of her investigation, Hutzell found evidence that the church had been burglarized by a forced entry through a window. In addition, Hutzell testified to the following events which occurred while she was sitting with Nancy at the hospital on July 29, 1983:
Q. On that date, July 29, 1983, do you recall what, if anything, was said when the Defendant was there in Nancy Drake's hospital room?
... .
A. On that evening, Nancy appeared rather agitated and from time to time made the statement that, "You don't care for me."
Q. Who was she saying that to?
A. To Mr. Drake. She said this, as I said, repeatedly from time to time. And Mr. Drake appeared in my opinion flustered and at one point asked her why she was saying these things? He had mentioned to me when she was saying these things also that she didn't usually talk like that.
He responded at one point to her, saying, "I do care for you."
When he asked why she was saying things like that, that's when I would like to refer to my report to get her statement exact. At the last point where she said, "You don't care for me at all," he replied with the statement that he did care, asking her why she was saying *212 things like that. She said, "Well, you certainly don't act like it." When he said, "Why are you saying things like that?" she replied, "How would you like me to hit you on your habit?"
Appellant made no response and left the hospital room shortly thereafter. When Hutzell followed him into the hall, he looked back at her twice as he departed but said nothing.
Pastor Charles Kirby testified that about $1,000 in cash and $2,800 in checks had been stolen. He said that Nancy would have had to obtain his permission to hang pictures in her office and that she had said nothing to him about this. He said that the church burglary had occurred some weeks before Nancy was attacked. He observed that the relationship between appellant and Nancy appeared to be good although Nancy seemed overpossessive.
Gene Miley testified that in May of 1983 he sold Nancy a $10,000 life insurance policy in which she named appellant as the beneficiary. Joel Schwartzberg testified that on one occasion appellant denied knowing anything about whether his wife had life insurance. Subsequently, appellant admitted that he was present when she took out the policy. Schwartzberg also testified that appellant told him that he figured there was only about $700 in the church when Nancy was attacked. Schwartzberg said that the Drakes' financial situation was such that they "lived from week to week."
Dr. David Taxdal, a neurosurgeon who treated Nancy, gave the opinion that it would be very unlikely that Nancy would regain her memory about how she received her injuries. He testified that on January 18, 1984, she told him that she remembered an unidentified person asking her for change for a $100 bill and that when she went to the safe to get it, she was struck on her head. Although in opening argument appellant's counsel stated that Nancy would testify in appellant's behalf, she did not take the stand.
Carol Lopata testified that she had been having an affair with appellant since 1982. He saw her every Monday night when his duties as a truck driver took him to Fort Lauderdale. He had told her he had divorced his wife in May of 1983. She said that she was supposed to come to Winter Haven and move in with appellant in July of 1983. Appellant called her the night that his wife was attacked. She came to Winter Haven four days later and appellant paid for her motel room. She said that after visiting his wife in the hospital during the daytime, he spent the night with her and had sex. She testified that appellant told her that he left the church at 11:30 a.m. on the day Nancy was attacked. After spending two days in Winter Haven, Lopata took an airplane to Pittsburgh for a class reunion. On July 17, 1983, appellant flew to Pittsburgh and drove her back to Fort Lauderdale. Shortly thereafter, she and her children moved in with him at his home in Winter Haven. Other witnesses corroborated her presence in Winter Haven both before and after her trip to Pittsburgh. She said she did not learn that appellant was still married until after his arrest.
After receiving appropriate Miranda warnings, appellant gave a voluntary statement to investigator Darrell Kirkland of the Winter Haven Police Department. Kirkland testified that before taping appellant's statement:
A. Mr. Drake said, "Darrell," he says, "I have some problems." I says, "Tom, what kind of problems do you have?" Tom says, "I wake up at the nighttime, I wake up in the morning, I hear Nancy voice, she's hollering for me to, `Stop, stop Tom, no Tom, no Tom, please Tom'."
He went over that for just a minute or two, and he was very consistent with stating that his wife, he hears his wife, his wife's voice telling him to stop and not to.
Then Mr. Drake stated, "Darrell, I've hurt Nancy and I do not want to hurt Carol. I'll tell you anything you want to know about this case, but please do not get Carol involved in this mess."
*213 Appellant then gave a taped statement in which he said he arrived at the church about 12:15 p.m. just as Althea Toth was leaving. While he was there, a woman came in to buy some tickets, and a man left an estimate for roof repairs. He also told of talking on the telephone to Pat Morgan. The following taped colloquy then transpired:
"MR. KIRKLAND: Why did you hurt Nancy?
"MR. DRAKE: I.
"MR. KIRKLAND: Can you tell me, was it for money or was it?
"MR. DRAKE: I don't want to hurt Nancy, I don't want to hurt Nancy.
"MR. KIRKLAND: Was it for the other woman?
"MR. DRAKE: I'd already hurt Nancy. We'd already talked about me getting a divorce and splitting up and we're, that was what we agreed to. Nobody, nobody really knowed it yet because we knew what it would do to, what people would think. I was just going to leave, that was going to be it. No, it wasn't the other woman, Darrell.
"MR. KIRKLAND: Was it the money, Tom, or did you need the money?
"MR. DRAKE: No, no, I don't need money, I don't have any money but I don't need, I, I had enough to live on.
"MR. KIRKLAND: Well why did it happen, Tom?
"MR. DRAKE: Why what happen?
"MR. KIRKLAND: Why did Nancy get hurt the way she did?
"MR. DRAKE: I don't know, Darrell, I don't know.
... .
*214 "MR. KIRKLAND: ... Is there times, Tom, you forget what's going on? You say you, you, you've made some statements to me that you wake up and Nancy is telling you, `No, Tom, no Tom, no Tom.' Was she saying that the day this happened, `No, Tom'?
"MR. DRAKE: I don't know Darrell, I don't re-, I.
"MR. KIRKLAND: You just don't remember it?
"MR. DRAKE: I don't remember anything like that happening, honest, I don't.
"MR. KIRKLAND: But it could have happened but you just 
"MR. DRAKE: I 
"MR. KIRKLAND:  don't remember?
"MR. DRAKE: I don't remember, I (unintelligible) no, I, it did happen, I mean something happened. I don't, I didn't do it, I couldn't. Not to her. She'd never hurt anybody. I hurt her enough because we was going to be separated.
"MR. KIRKLAND: Did she know about your girlfriend Carol?
"MR. DRAKE: Yes, she heard all about it (tape break). And that was one of the reason we were leaving, because (tape break).
"MR. KIRKLAND: Were you having trouble remembering the event? I mean, you were waking up worrying about it evidently when Nancy 
"MR. DRAKE: I woke up hearing heard it night after night after night. She said, `No, Tom, no, no Tom, no.' That's the only thing I can remember. That's just, I just, it's just her voice there just coming over and over and over. And she just wakes me up all the time. But I couldn't.
"MR. KIRKLAND: Is it your conscience bothering you, Tom, the reason you wake up?
"MR. DRAKE: Darrell, I 
"MR. KIRKLAND: You just 
"MR. DRAKE:  I don't know what. I don't know.
"MR. KIRKLAND: So you had planned to leave Nancy and marry Carol?
"MR. DRAKE: It's not  we hadn't even talked of marriage. I just wasn't happy, hadn't been for a long time and 
... .
"MR. KIRKLAND: Why do you keep waking up in the morning with Nancy hollering?
"MR. DRAKE: I don't know why. I don't know why.
"MR. KIRKLAND: You don't have any idea? Could it be that you did hit her and you don't remember?
"MR. DRAKE: I don't know, it could be, I don't know. Darrell, I'm saying I don't know. If I thought I did, I, I'd kill myself. I wouldn't have.
"MR. KIRKLAND: You just don't remember?
"MR. DRAKE: No, honest to God, I don't know, Darrell. I swear to God, I don't know.
"MR. KIRKLAND: You started to say something, if you did, what?
"MR. DRAKE: I just saying if I'm lying, God strike me dead right here. I don't know, Darrell.
"MR. KIRKLAND: You just don't know if you did it or not?
"MR. DRAKE: I don't know. It's not me, I couldn't, it's not me."
Appellant took the stand and denied attacking his wife or stealing the money. He said that earlier in the morning of July 8, 1983, he had picked up the hammer to hang a picture for Nancy but when he could not find any nails he left it on top of the safe. He came back about 12:15 p.m. to bring Nancy some lunch. As he pulled in, he saw Nancy talking to Althea Toth. He also noticed a cream-colored station wagon in the parking lot. Nancy gave him the check which Toth had delivered for him. While he was in the church, a woman came in to buy some tickets. After talking with Pat Morgan on the telephone, he drove home.
Appellant admitted becoming involved with Carol Lopata in 1982 but said that he had broken off the relationship in February 1983. He denied being intimate with Lopata after that date. He also denied spending the night with her in the motel in Winter Haven while Nancy was in the hospital. He said he never told Lopata that he had divorced Nancy. However, he admitted flying to Pittsburgh to drive Lopata back to Florida. He said he let her stay in his house because she had not yet found a place of her own. He acknowledged that Lopata was more physically attractive than his wife. He did not work after Nancy was injured. However, he said he was not short of money because various church members made substantial donations to the family.
Appellant denied telling Schwartzberg that he did not know about Nancy's insurance. He said that he was upset during his police interrogation because he was harassed by officer Toffarelli. Both Toffarelli and officer Kirkland stated that Toffarelli was at the station when appellant was questioned, but he did not participate in the interrogation.
Appellant first argues that the court erred in permitting officer Hutzell to relate what appellant's wife said to appellant at the hospital over objections grounded on hearsay and relevancy. However, there is an exception to the hearsay rule concerning admissions which permits the introduction of a statement offered against a party of which he has manifested his adoption or belief in its truth. § 90.803(18)(b), Fla. Stat. (1983). Thus, under the proper circumstances, a defendant's silence in the face of a third party's accusation can be inferred to be an assent to its truth. Privett v. State, 417 So.2d 805 (Fla. 5th DCA 1982). While not characterized as relating to an admission, the supreme court in Breedlove v. State, 413 So.2d 1 (Fla. 1982), cert. denied, 459 U.S. 882, 103 S.Ct. 184, 74 L.Ed.2d 149 (1982), held that the substance of statements made by the defendant's relatives, which detectives testified they had told the defendant, was not hearsay because it was admitted to show the effect on the defendant rather than for the truth of what the relatives said.
It is difficult to assess the impact of officer Hutzell's testimony because of different interpretations which could be placed upon the words "how would you like *215 me to hit you on your habit?" To the extent these words could be construed as an accusation, their introduction provided a proper predicate for proof of an admission by silence. On the other hand, if the words are considered to be meaningless, officer Hutzell's testimony would be irrelevant, but under such circumstances it would also be harmless. Upon consideration, we cannot say that the admission of the evidence concerning what happened at the hospital was reversible error.
The appellant also attacks the admission of appellant's statements concerning his dreams as being irrelevant. To the contrary, we believe that the jury might properly find these statements most relevant in the context of a person with a consciousness of guilt. Appellant's contention that he did not tell officer Kirkland that he had dreamed that Nancy had said "stop Tom" in addition to simply "no Tom" was a matter for the jury to evaluate. We know of no reason why the admission of this testimony was improper.
Finally, we must determine whether the evidence is legally sufficient to sustain the verdict of guilt. The state's case was built upon circumstantial evidence. It is well settled that regardless of how strongly the evidence may suggest guilt, where the only proof of guilt is circumstantial a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla. 1956). Therefore, an analysis of the pertinent evidence is required.
There was ample evidence of the appellant's motive to commit the crimes. Appellant was leading a double life. He was engaged in an extramarital affair with Carol Lopata, who was more attractive than Nancy. He told Carol that he had already divorced his wife, and she was planning to move to Winter Haven in July of 1983 to live with appellant. Appellant's financial condition was such that he needed the money which could be obtained from robbing the church. He was also a beneficiary of his wife's recently acquired life insurance policy.
Appellant was the last person known to be with Nancy before she was attacked. While the witnesses' estimates of time did not precisely coincide, the evidence supports the conclusion that no more than ten minutes elapsed between the time that appellant was known to be at the church alone with Nancy and when Nancy was attacked. Appellant's subsequent conduct tended to confirm police suspicions. He told Carol Lopata that he had left the church at 11:30 a.m. When asked by Joel Schwartzberg, he first denied knowing anything about Nancy's life insurance policy. He volunteered that his fingerprints would be on the hammer, but his explanation for having recently used the hammer was contradicted. While he said he lived on funds donated in Nancy's behalf, the fact remains that he had substantial sums of money in his possession following the crimes.
Appellant's statements to the police were particularly disturbing. In addition to his comments about his dreams, he seemed to be saying that he could have attacked his wife but he didn't remember. The jury had a right to conclude that appellant's statements were not those of an innocent man.
Appellant's testimony was contradicted in many respects, the most notable of which concerned his relationship with Carol Lopata. Therefore, the version of events related by appellant did not have to be believed. See Bradford v. State, 460 So.2d 926 (Fla. 2d DCA 1984). Appellant's suggestion that his wife was injured at the hands of either Ray Starr or the unknown driver of the cream-colored station wagon cannot be said, as a matter of law, to constitute reasonable hypotheses of innocence. In discussing cases premised upon circumstantial evidence, the supreme court in Heiney v. State, 447 So.2d 210, 212 (Fla. 1984), cert. denied, ___ U.S. ___, 105 S.Ct. 303, 83 L.Ed.2d 237 (1984), recently stated:
The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, *216 and where there is substantial, competent evidence to support the jury verdict, we will not reverse a judgment based upon a verdict returned by the jury.
We hold that the evidence was sufficient to sustain the jury's verdict of guilt.
Affirmed.
SCHEB and OTT, JJ., concur.