Bryan K. WILSON, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–1097.

District of Columbia Court of Appeals.

Argued March 11, 2010.
Decided May 6, 2010.

Thomas D. Engle, appointed by the court, with whom Sharon L. Burka was on the brief, for appellant.

Katherine M. Kelly, Assistant United States Attorney, with whom Channing D. Phillips, Acting United States Attorney at the time the brief was filed, and Roy W. McLeese III, Chrisellen R. Kolb and Matthew P. Cohen, Assistant United States Attorneys, were on the brief, for appellee.

Before REID and THOMPSON, Associate Judges, and WAGNER, Senior Judge.

THOMPSON, Associate Judge:

Appellant Bryan K. Wilson was convicted of first-degree premeditated murder while armed and of several weapons charges in connection with the death of his wife Inga Wilson.[1] In this appeal, he argues that (1) the trial court's ruling disqualifying an attorney that he sought to add to his defense team violated his Sixth Amendment right to counsel; (2) the admission of a videotape violated his rights under the Confrontation Clause of the Sixth Amendment; (3) the court erred by allowing the government to present hearsay testimony; (4) there was insufficient evidence to prove beyond a reasonable doubt that appellant was guilty of murdering his wife; and (5) the claimed errors in combination affected the verdicts, warranting reversal. Unpersuaded by appellant's arguments, we affirm.

## I.

The government presented evidence that, on the afternoon of December 13,

---

1. The weapons convictions were for possession of a firearm during a crime of violence (D.C.Code § 22–4504(b) (2001)), carrying a pistol without a license (D.C.Code § 22–4504(a) (2001)), possession of an unregistered firearm (D.C.Code § 7–2502.01 (2001)), and unlawful possession of ammunition (D.C.Code § 7–2506.01(a)(3) (2001)).

2003, Inga Wilson was found dead in the passenger seat of her Ford Expedition, which was parked in the 3000 block of Adams Street, N.E. She had been shot four times in the head and died sometime around 12:00 a.m. on December 13, 2003. After police arrived on the scene, they discovered that both the vehicle and the decedent had been reported missing. Police contacted appellant to inform him of his wife's death and later that day interviewed him to gather information regarding the decedent's death.

Detective George Blackwell testified that appellant told him that on the evening of December 12, 2003, he and his wife went to dinner at an Olive Garden restaurant and then to a movie in Waldorf, Maryland. According to appellant's account, when they arrived at their home in Upper Marlboro, Maryland just after 11:00 p.m., his wife said she wanted something sweet to eat. Appellant remained at home while his wife went to a Shell gas station about a quarter-mile away to purchase candy. He fell asleep on the couch and when he woke up, his wife had not returned. When she did not answer her cell phone, appellant got into his car and drove by the gas station and around the neighborhood, searching for her. Appellant told police that he could not recall the name of the movie he and his wife saw and that he was not in the District of Columbia that evening.

On December 31, 2003, appellant was interviewed by FBI Agent Gary Gerszewski. During that interview, appellant told Agent Gerszewski that after dinner at the Olive Garden, he and his wife had seen the 9:30 p.m. showing of the movie "Bad Santa" in Waldorf. Appellant repeated the account he had given Detective Blackwell

about the couple returning home around 11:00 p.m.; Inga Wilson going to the Shell station to purchase a sweet snack; appellant falling asleep, waking to discover that his wife was not home, and placing a call to her (which he said went directly to her voice mail); and appellant going out to search for her in the neighborhood around his home and the adjacent neighborhood. In addition, he told Agent Gerszewski that while searching for his wife, he saw a woman in the parking lot of the Shell station changing her car tire and he offered assistance. After he changed the tire, the woman gave him a ride to his house, where he retrieved money, which he used to put gas in the woman's car after they drove back to the Shell station and to give her $100 to pay for the replacement tire. Thereafter, appellant returned home, called his mother, continued the search for his wife, and, at around 3:30 or 3:40 a.m., called 911 to report his wife missing.

The government also presented testimony by Renee Benjamin, appellant's former co-worker, with whom he began a romantic relationship in June 2003. Benjamin testified that appellant told her that he was not happy in his marriage and that he was planning to leave his wife. On December 5, 2003, Benjamin received a phone call from appellant stating that his wife and two of his children had been in a car accident. Later that afternoon, appellant called Benjamin again and said that the children were doing well, but that his wife had internal bleeding. On December 7 or December 8, 2003, Benjamin received another call from appellant, who said that his wife had taken a turn for the worse and the family had to decide whether to remove her life support.[2] Appellant informed Benjamin on Friday, December 12,

---

**2.** By contrast, Inga Wilson's supervisor testified that she had been present at work every

day during the week before her death.

2003, that he and his in-laws were going to remove his wife's life support that evening. Sometime after 12:00 a.m. on December 13, 2003, Benjamin received another phone call from appellant, who asked Benjamin to come and pick him up in the District because he had lent his car to someone. Benjamin told him that she could not do so. The next morning, appellant called Benjamin to inform her that he had paid a woman $100 to drive him home from the District.

FBI Agent Brad Garrett testified that during the investigation of decedent's death, one of appellant's friends, Tracy Thompson, told investigators that he had given appellant a gun. Agent Garrett further testified that Thompson offered to allow agents to place video and audio recording equipment in his car and to engage appellant in a conversation that investigators could record. During a recorded conversation that took place on January 6, 2005, appellant denied killing his wife but told Thompson that he had thrown the gun that Thompson had given him into the Patuxent River right after the police called him to inform him that his wife's body had been found. As described in more detail *infra*, the government relied on the videotape to prove that Thompson gave appellant a gun a week before Inga Wilson's murder.

An insurance company officer testified that on December 19, 2003, the company received an application from appellant to purchase a life insurance policy on his wife. The application had been completed on December 7, 2003. The government also presented the testimony of a cell phone expert, who told the jury that he was "one hundred percent" certain that on December 13, 2003 at 12:51 a.m., appellant's cell phone was located nowhere near Upper Marlboro, Maryland, because, in placing an outgoing call, the cell phone had connected with a cell phone tower in the District—specifically, the cell phone tower closest to the location where Inga Wilson's body was found.

The defense offered the testimony of several witnesses. A DNA expert testified that DNA from an unknown male was found on the underside of Inga Wilson's fingernails. The expert acknowledged that the analysis did not reveal how long the DNA had been there or how it got there, but testified that appellant and his two sons were excluded as the source of the DNA. Bobby Segears and his son Brandon testified that at approximately 12:45 or 1:00 a.m. on December 13, 2003, they were walking home from a bus stop and saw a Ford Expedition parked on the 3000 block of Adams Street. Bobby testified that he saw a man and a woman inside the car talking. Both Bobby and Brandon testified that appellant was not the man they saw inside the car. On cross-examination, both said that it was difficult to see inside the vehicle because its interior lights were off and its windows were tinted.

After the jury returned its guilty verdicts, the trial court denied appellant's motion for a new trial. This appeal followed.

## II.

During the weekend before appellant's trial was set to begin, the prosecutor learned that criminal defense attorney Douglas Evans had joined appellant's defense team. The prosecutor notified one of appellant's other attorneys that Evans had a conflict because Evans had represented Tracy Thompson—appellant's friend who gave him a gun and who consented to having his conversation with appellant recorded—when Thompson testified at the grand jury proceedings that led to appellant's indictment. When Evans appeared in the courtroom on the day trial was to begin, he told the court that he had

not remembered meeting with Thompson, but, once his memory was jogged by the prosecutor's comments, he recalled having represented him. Evans urged that this should not disqualify him from representing appellant because he did not remember any details regarding the representation of Thompson,[3] and thus had not and could not share any such details with the other defense lawyers; that one of the other defense lawyers could cross-examine Thompson if he testified at trial; and that any potential conflict therefore would be eliminated. The prosecutor disagreed, arguing that Thompson was a key witness and the conflict was not waivable. In disqualifying Evans from representing appellant, the trial court found that there was a conflict based on Evans's prior representation of Thompson in this case. The court reasoned that there was a conflict because even if Evans was then unable to remember details of his representation of Thompson, he might remember the details later. The court also sought to avoid creating a situation of ineffective assistance of counsel that might arise if Evans were to represent appellant but fail to cross-examine Thompson.

■■■ Appellant argues that the court's ruling disqualifying Evans deprived him of retained counsel of his choice and therefore violated his Sixth Amendment right to counsel.[4] We review a trial court's decision to disqualify counsel for abuse of discretion. *Pinkney v. United States*, 851 A.2d 479, 488 (D.C.2004). The trial court's determination regarding whether a disqualifying conflict exists "presents a mixed question of law and fact." *Veney v. United States*, 738 A.2d 1185, 1193 (D.C.1999) (citation and internal quotation marks omitted). We accept the trial court's factual findings unless they lack evidentiary support, and we review legal issues *de novo. Id.*

■■■ The Sixth Amendment right to counsel encompasses a "right of a defendant who does not require appointed counsel to choose who will represent him." *Gonzalez–Lopez*, 548 U.S. at 144, 126 S.Ct. 2557 (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988)).[5] However, the presumption in

---

3. Evans told the court that "to be perfectly candid with the court, I don't even remember anything this young man may have told me."

4. As appellant notes, "erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error," making it "unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation," because such an error "bears directly on the framework within which the trial proceeds." *United States v. Gonzalez–Lopez*, 548 U.S. 140, 148, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (citations and internal quotation marks omitted).

We note that, in this case, the "bear[ing] ... on the framework within which the trial proceeds" was somewhat called into question by the prosecutor's advice to the court that Evans "[is] here now because Mr. Gersteinfeld [one of appellant's other trial counsel] is

a Maryland bar member and needs a D.C. stand-in to be here pro hoc [sic]." The prosecutor also stated that Mr. Gersteinfeld "has another D.C. bar member at the table." Although appellant's counsel questioned this explanation at oral argument before this court, neither Evans nor appellant's other trial counsel disputed it during the discussion of the disqualification issue in the trial court, perhaps thereby conveying the impression that Mr. Evans was not expected to play a major role in presenting or shaping the defense case. This does not appear to have been a factor in the court's disqualification ruling, however; therefore, we need not discuss it further.

5. *But see id.* at 151, 126 S.Ct. 2557 ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them").

favor of a defendant's counsel of choice can be overcome upon a showing of an actual or potential conflict. *Wheat,* 486 U.S. at 163, 164, 108 S.Ct. 1692; *Pinkney,* 851 A.2d at 487. "An actual conflict in successive representation may arise where the subject matter of the previous representation is *substantially related* to the case being tried, the attorney reveals privileged communications of the former client stemming from the previous representation, or the attorney's loyalties are otherwise divided." *Pinkney,* 851 A.2d at 487 (italics in the original) (quoting *Veney,* 738 A.2d at 1193). Here, Evans's previous representation of Thompson was regarding the same matter as the case being tried, certainly suggesting that a conflict existed. *See id.* at 487 n. 8 (citing cases where defense counsel had represented a government witness in grand jury testimony as examples involving representations in "substantially related" subject matters); *In re Grand Jury Proceedings,* 859 F.2d 1021, 1026 (1st Cir.1988) (stating that disqualification is proper where there is a direct link between the clients of an attorney or evidence that one client has information about another client, such as where an immunized government witness has information about the target of a grand jury investigation). Appellant urges, nevertheless, that the trial court erred in disqualifying Evans, because, in light of Evans's not remembering anything about the substance of his representation of Thompson, there was no possibility that Evans would rely on or be influenced by information obtained in the course of that prior representation.

■ We can find no abuse of discretion in the court's decision to disqualify Evans because Evans's inability to remember even whether he had acquired information from his representation of Thompson made it impossible for the court to assess wheth-

er a conflict could arise at trial. The possibility that Evans would remember information during trial, and would be forced to choose between using the information to the advantage of appellant and refraining from using it to appellant's disadvantage was a sufficient basis for the court to conclude that the potential for conflict overcame appellant's presumptive right to retain the counsel of his choice. *See Wheat,* 486 U.S. at 163, 108 S.Ct. 1692 ("[T]he [trial] court must be allowed substantial latitude in ... cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses."); *United States v. Baker,* 10 F.3d 1374, 1398–99 (9th Cir.1993) (upholding the trial court's conclusion that a potential conflict disqualified an attorney, because an actual conflict could arise during trial if the attorney remembered any confidential information he had learned from the previous representation), *overruled on other grounds by United States v. Nordby,* 225 F.3d 1053 (9th Cir. 2000). Moreover, the trial court had an "obligation to ensure that there was no appearance of impropriety." *Fortson v. United States,* 979 A.2d 643, 652 (D.C. 2009); *see also Pinkney,* 851 A.2d at 489 (holding that trial court did not abuse its discretion in refusing defendant's waiver of conflict because "the appearance of impropriety was too great under the circumstances presented here"). Further, because the trial court had a duty to inquire into the possible impact on the effectiveness of counsel when the issue of a conflict arose, *see Pinkney,* 851 A.2d at 486, it was proper for the court to consider the implications for the defense's cross-examination of Thompson if he should testify at appellant's trial. Although appellant is correct that the government "bears a heavy burden in demonstrating that disqualification was justified," *In re Grand Jury Proceedings,* 859 F.2d at 1026, we are satisfied

that the government met that burden where it pointed out the "direct link between the clients of an attorney," *id.*, and where the government could not have known whether Evans obtained information from Thompson pertinent to appellant's case and the content of any information that Evans may have learned.

### III.

During his conversation with appellant that was recorded via government video and audio surveillance equipment, Thompson repeatedly expressed dismay or anger that appellant had used the gun Thompson gave him before December 12, 2003, to kill Inga Wilson, making both appellant and Thompson targets of the police investigation. Before trial, appellant asked the court to suppress the videotaped conversation, arguing that it was unduly prejudicial, that on the tape Thompson made assertions of fact not otherwise in evidence, and that if Thompson was not called to testify at the trial, admitting the videotape would violate appellant's right to confront witnesses against him. The government argued that most of Thompson's statements were questions and not assertions; and that any assertions he made were being offered to provide context for appellant's own statements, not to prove the truth of the matter asserted.[6] The trial court denied appellant's motion and permitted the government to play the entire videotape for the jury.

Renewing his Sixth Amendment Confrontation Clause argument on appeal, appellant emphasizes that (1) many of Thompson's statements on the videotape asserted or implied that appellant killed his wife (statements that appellant argues

were especially damaging to the defense since they conveyed to the jury that even appellant's longtime friend was convinced of his guilt), and (2) Thompson's statements on the videotape were the sole evidence that Thompson supplied appellant with a gun just one week before the murder, evidence about timing that strengthened the government's case.

 *Crawford v. Washington* established that the Confrontation Clause bars the admission of testimonial hearsay when the declarant is not present at trial for cross-examination, unless the declarant is unavailable and was subject to prior cross examination. 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). "[A] crucial aspect of *Crawford* is that it only covers hearsay, i.e., out-of-court statements offered in evidence to prove the truth of the matter asserted." *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir.2006) (citation and internal quotation marks omitted); *Coleman v. United States*, 948 A.2d 534, 545 (D.C.2008) ("[I]t is only *testimonial* hearsay statements that are subject to the Confrontation Clause"). Thus, the Confrontation Clause does not bar the admission of out-of-court statements admitted for a purpose other than to establish the truth of the matter asserted, such as to provide a context for a defendant's own statements or admissions. *See Tolliver*, 454 F.3d at 666 (explaining that where a declarant's statements "put [defendant's] admissions on the tapes into context, making the admissions intelligible for the jury[,] ... the admission of such context evidence does not offend the Confrontation Clause because the declarant is not a wit-

---

**6.** The prosecutor suggested that the court could give a limiting instruction to inform the jury about the limited purpose for which Thompson's statements on the videotape were offered. However, the defense did not request such an instruction, and no such instruction was given.

ness against the accused").[7] In resolving appellant's Confrontation Clause claim, our focus is on whether Thompson's statements were admitted for the truth of what was asserted, and if so, whether, for federal constitutional purposes, they nevertheless were non-hearsay because they were appellant's own "adoptive admissions," as the government contends.[8]

■ Turning first to appellant's argument that the trial court erred in admitting those portions of the videotape in which Thompson asserted that appellant killed his wife, we conclude that there was

7. *See also United States v. Thomas*, No. 09–13138, 2010 WL 827906, at *5, 2010 U.S.App. LEXIS 5204, at *13–*14 (11th Cir. Mar. 11, 2010) (holding that the admission of tape recorded conversations between defendant and "Darlene" did not violate defendant's right of confrontation under the Sixth Amendment because the government "offered the conversations to place in context [defendant's] responses to Darlene, not to establish the truth of Darlene's statements," because defendant's responses were "enigmatic without Darlene's questions to place them in context," and because Darlene's statements "provide context for [defendant's] cryptic remarks to Darlene about the time and location of the drug transaction"); *United States v. Hendricks*, 395 F.3d 173, 184 (3d Cir.2005) (holding that admission of statements by a criminal informant that are reasonably required to place the defendant's statements into context does not violate defendant's Confrontation Clause rights); *see also Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) ("The *nonhearsay* aspect of [witness's account] of Peele's confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns").

8. Under Federal Rule of Evidence 801(d)(2)(B), an adoptive admission, i.e., "a statement of which [a party-opponent] has manifested an adoption or belief in its truth," is "not hearsay." By contrast, although we have adopted the substance of Rule 801(d)(2), *see Comford v. United States*, 947 A.2d 1181, 1185 (D.C.2008), "our cases continue to treat party-admissions as an *exception* to the rule against hearsay." *Id.* (italics added). However, as *Crawford* established, the fact that evidence is admissible under a hearsay exception does not resolve the issue of whether its admission violates a defendant's Confrontation Clause rights. Because we must consider the hearsay status *vel non* of Thompson's statements on the videotape to determine whether their admission was improper as a federal constitutional matter, we believe it is appropriate to utilize the federal framework of analysis—i.e., the rule that a statement adopted as a party-admission is *not* hearsay (rather than the rule of our case law that party-admissions are admissible under an *exception* to the hearsay rule). *Cf. Moran v. Burbine*, 475 U.S. 412, 429 n. 3, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (explaining that if the issue of whether Sixth Amendment rights were triggered depended on whether there existed an attorney-client relationship, "the type of circumstances that would give rise to the right would certainly have a federal definition," and would not be controlled by "a state court's interpretation of state law" regarding when such a relationship exists).

An alternative approach in resolving appellant's Confrontation Clause challenge would be to focus on whether Thompson's statements were *testimonial* rather than on whether they were hearsay at all. We reasoned in a previous case that certain statements did not constitute "testimonial statements within the meaning of *Crawford*" because they "were not elicited during structured police interrogation or given by the declarant to any law enforcement officer." *Hammond v. United States*, 880 A.2d 1066, 1100 (D.C.2005) (citing, *inter alia*, the holding in *United States v. Saget*, 377 F.3d 223, 229 (2d Cir.2004), that "a declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*"). That can also be said of Thompson's statements here. But the fact that Thompson made the statements while cooperating with the FBI in an effort to elicit and record incriminating statements by appellant makes it much more difficult (if possible at all) to conclude that the statements, if hearsay, were non-testimonial. Our conclusion that the statements (together with appellant's responses) were not hearsay, but instead were appellant's own adoptive admissions, obviates the need for an analysis of whether the statements were testimonial.

no Confrontation Clause violation. We have no trouble concluding · that these statements were not admitted to prove the truth of the matter asserted. As the jury had been informed (through the testimony of Agent Garrett), Thompson cooperated with the government in an attempt to get appellant to confess to or to reveal any information he had about the murder. We think it would have been apparent to the jury that Thompson's statements about appellant committing the murder were made to elicit a confession or other incriminating information from appellant, and that Thompson's statements were not themselves evidence that appellant committed the murder.[9] And, to the extent that Thompson's willingness to cooperate with investigators to gather evidence against appellant signaled to the jury that appel-

lant's long-time friend Thompson distrusted appellant or believed he was guilty, that signal was already conveyed by Garrett's testimony about Thompson's agreement to cooperate with law enforcement agents.

■ As to Thompson's utterances about his giving appellant a gun a week before the murder, the government does not deny that the statements were admitted for their truth. Indeed, it could not in good faith do so, because, in both his opening and closing arguments, the prosecutor relied on Thompson's words (together with appellant's responses or silence) to establish the fact that Thompson gave appellant a gun a week before the murder.[10] Rather, the government contends that Thompson's utterances were admissible as (non-hearsay) adoptive admissions, i.e., to make

9. Some jurisdictions have required a limiting instruction when third-party statements are admitted for non-hearsay purposes. *See, e.g., Sanabria v. State*, 974 A.2d 107, 116 (Del.Super.Ct.2009) ("[I]f the trial court concludes that the probative value of the background information is not substantially outweighed by its unfair prejudice to the defendant and decides to admit a third-party statement into evidence, the admission of the background information must be accompanied by a limiting instruction to the jury"). We have not adopted such a *per se* rule, however, *see Johnson v. United States*, 387 A.2d 1084, 1087 (D.C.1978) (en banc) (explicitly rejecting rule that the trial court has "an absolute *sua sponte* obligation to issue an immediate cautioning instruction whenever evidence is brought in which is admissible only for a limited purpose"), and appellant did not request a limiting instruction at trial (even though the government expressed its willingness to have one). We therefore cannot find reversible error. *See Gilliam v. United States*, 707 A.2d 784, 785 (D.C.1998) (en banc) ("in any case—without exception—in which evidence has been properly admitted for a specific purpose and the defense has not requested an instruction limiting jury consideration of it to that use, the trial court's failure to instruct in that manner on its own initiative is reviewable only for plain error"); *Jones v.*

*United States*, 477 A.2d 231, 242 (D.C.1984) (concluding that the plain-error test was not met because the court's omission of a limiting instruction was not "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial") (citation and internal quotation marks omitted). We are satisfied that the jury, aware that Thompson was attempting to get appellant to incriminate himself, would have understood that Thompson's unadopted statements were not offered for the truth of the matter asserted. *Cf. United States v. Kenyon*, 481 F.3d 1054, 1063 (8th Cir.2007) (holding that, despite the absence of a limiting instruction, third-party statements were admissible as background information about the police investigation, because it was "unlikely the jury gave it greater effect").

10. Given this, we agree with appellant that Thompson's utterances containing references to his giving appellant a gun a week before the murder are correctly treated as statements that require an analysis of whether they were hearsay, even though (as shown by the passages we quote *infra*) the utterances were couched as questions. *See Martin v. United States*, 991 A.2d 791, 797 (D.C.2010) ("[Q]uestions usually cannot be characterized as intentional assertions and hence are not hearsay. But that is not invariably so.").

appellant's responses "recognizable as admissions,"[11] and for that reason did not give rise to a Confrontation Clause violation when played for the jury. *See Hernandez v. State*, 979 So.2d 1013, 1016–17 (Fla.Dist.Ct.App.2008) (stating that adoptive admissions do not violate the Confrontation Clause); *United States v. Kehoe*, 310 F.3d 579, 591 (8th Cir.2002) (pre-*Crawford* case holding that the Confrontation Clause did not guarantee the defendant the right to cross-examine a speaker whose statements were imputed to the defendant as adoptive admissions of a party opponent).

 "A defendant may make an admission by adopting or acquiescing in the statement of another." *Blackson v. United States*, 979 A.2d 1, 6 (D.C.2009) (quoting *Harris v. United States*, 834 A.2d 106, 116 (D.C.2003) (internal quotation marks omitted)). For a court to admit a statement as an adoptive admission, there need not be evidence that a defendant explicitly adopted another's statement, but there must be "some manifestation of [his] intent to adopt another's statements or evidence of [his] belief in the truth of the statements." *Harris*, 834 A.2d at 117 (quoting *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir.1988)). "Whether the defendant acquiesced in the statement can … be shown by the context of the conversation and the surrounding circumstances." *Brown v. United States*, 464 A.2d 120, 124 (D.C.1983). "When a statement is made in the presence of a party containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny, failure to speak has traditionally been received as an ad-

mission[,]" *Comford*, 947 A.2d at 1185 (quoting 2 *McCormick on Evidence* § 262 (6th ed. 2006)), so long as "the statement [was] made in the defendant's presence and hearing, and the defendant … actually underst[ood] what was said and [had] an opportunity to deny it." *Foreman v. United States*, 792 A.2d 1043, 1052 (D.C.2002) (citation omitted). For a statement to be admissible as an adoptive admission, there is "no need for the evidence to *clearly prove* that [defendant] heard, understood, and unambiguously assented to all of the statements with his silence." *Blackson*, 979 A.2d at 8 (internal quotation marks omitted) (italics added). "[R]ather, such statements are admissible as adoptive admissions so long as there is sufficient evidence from which a jury could reasonably conclude that the defendant unambiguously adopted another person's incriminating statement." *Id.* (citation and internal quotation marks omitted).

At three points during the recorded conversation between Thompson and appellant that is in issue here, Thompson asked questions that referred to his having given appellant a gun a week before Inga Wilson's death. At one point, there was the following exchange:

> Thompson: Well, why I got to lie then? Why—why I'm not tellin' [the police] I gave you a motherf***in' gun a week before your wife died?"
>
> Appellant: Because that's gonna put everybody in it.

Shortly after that exchange, Thompson had the following exchange, in appellant's presence, with appellant's girlfriend, Sonya Jenkins, who was also present during the recorded conversation:

---

11. *Brown v. United States*, 464 A.2d 120, 124 n. 4 (D.C.1983) (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C.Cir.1973), and explaining that another individual's statements accompanied the defendant's statements not as evidence of the truth of the former's contents but to make the defendant's responses "intelligible to the jury and recognizable as admissions").

Thompson: Do you know I gave [appellant] a gun a week before his wife got killed? Do you know that?! You know that. You really know that."

Jenkins: [Inaudible]

Thompson: You know it now.

Jenkins: I know.

Thompson: You knew it? You knew it, or you know it now?

Jenkins: I've known of it.

Thompson: That I gave him a gun?

Jenkins: Yes.

Appellant: Tracy, I ain't got no reason to lie to you, man.

The third time Thompson referred to his having given appellant a gun a week before the murder was in this exchange:

Thompson: How the f*** would you feel if somebody tell you for three months, 'Man, I need a gun. This dude's followin' me, he's threaten' me, he's threaten' my—' ... And all of a sudden, a motherf***in' week later, your motherf***in' wife gets shot."

Appellant: Tracy.

The government urges that in each of the exchanges quoted above, Thompson's statements or questions provided the context for an adoptive admission by appellant that Thompson gave him a gun a week before Inga Wilson's murder. In the first exchange, the government argues, although appellant did not explicitly adopt Thompson's assertion, the jury could reasonably find that his response—that Thompson's telling the truth would "put everybody in it"—was an acknowledgment of the short time span between appellant's receiving the gun and his wife's murder, and of the incriminating implications of that fact for both appellant and Thompson.

As to the other exchanges—appellant's saying nothing when Thompson asked Jenkins whether she knew that Thompson had given appellant a gun a week before the murder, and appellant's failure to dispute Thompson's statement that Inga Wilson was shot "a week later"—the government argues that appellant adopted Thompson's statements through his silence.

 The trial court found that the videotape, including the exchanges quoted above, "should come in in context with the defendant's statements.... [I]t's the defendant's statements that matter on that tape." Reviewing that determination *de novo*,[12] we agree that the exchanges above were admissible as adoptive admissions. The full transcript of the videotape creates no doubt that appellant was listening to Thompson's statements (and the videotape presumably provided visual confirmation of this). Thompson repeatedly expressed intense concern about the temporal proximity between his giving a gun to appellant and Inga Wilson's death, and appellant made repeated attempts to resolve Thompson's concerns by telling him that Thompson's lying to police would protect both men and by assuring Thompson that what looked like a set of facts that incriminated appellant as to the murder was not as it seemed. In light of appellant's desire to persuade Thompson to cooperate with appellant and to trust him, an obvious course would have been to deny or to correct, if he could, the very incriminating assertion about Inga Wilson's death following just one week after Thompson gave appellant a gun. Because this was an "assertion[ ] of fact which, if untrue, [appellant] would under all the circumstances naturally be expected to deny," *Comford,* 947 A.2d at

---

12. As we explained in *Blackson,* while a "trial court's decision to admit or exclude evidence is reviewed only for abuse of discretion," 979 A.2d at 6, the court's exercise of discretion must rest upon correct legal standards, and thus our review of a court's ruling on whether an utterance may be considered non-hearsay is *de novo* review of a question of law.

1185 (quoting 2 *McCormick on Evidence* § 262 (6th ed. 2006)), appellant's failure to object made it reasonable to regard his response as an admission. Appellant's failure to deny Thompson's assertions that he gave appellant a gun one week before Inga Wilson's murder is all the more notable for the fact that appellant *did* repeatedly deny that he had killed his wife when Thompson suggested otherwise. And, the fact that appellant remained silent even when Thompson directed to Sonya Jenkins his remarks about giving appellant a gun a week before Inga Wilson's death is a substantial factor in our conclusion, because "a failure to object or deny . . . statements at the time they were made is especially probative of the defendant's acquiescence *if they are made in the presence of a third party* who was not an accomplice in the crime." *Blackson*, 979 A.2d at 8 (citation and internal quotation marks omitted) (italics added). In sum, we are satisfied that there was sufficient evidence to support admissibility of the Thompson/appellant exchanges on the videotape for further consideration by the jury as adoptive admissions by appellant, and that the admission of the challenged portion of the exchanges for this purpose did not violate appellant's rights under the Confrontation Clause.

## IV.

Detective George Blackwell, the lead detective on the case who interviewed appellant on the evening of December 13, 2003, testified at trial about the investigation. After Detective Blackwell recounted appellant's version of the events of the previous evening, the prosecutor asked the detective about the steps he took to verify the information that appellant provided. When Detective Blackwell responded that police officers had conducted a canvass of appellant's neighborhood by going door-to-door to ask people whether they saw or heard anything related to the case, the prosecutor asked: "As a result of that canvass, did you become aware of anyone who claimed to have see [sic] or said they saw the Wilsons arriving home or Ms. Wilson leaving back out around 11 p.m. on Friday, December 12th, 2003?" Defense counsel objected to the question on hearsay grounds. The trial court overruled the objection, stating that it was not hearsay because it was an identification. After the objection was overruled by the trial court, Detective Blackwell answered the question by saying: "No." Appellant claims that the trial court erred in permitting Detective Blackwell's hearsay testimony.

The government agrees that Detective Blackwell's statement was not an identification, but argues that it also did not relay to the jury any out-of-court statement by any of appellant's neighbors who may have been queried, and thus did not constitute hearsay. *See Carter v. United States*, 614 A.2d 542, 545 n. 9 (D.C.1992) ("Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Though perhaps technically accurate, this argument is not entirely persuasive. If Detective Blackwell himself participated in the canvassing, as his testimony implied, his "no" answer to the question "did you become aware of anyone who claimed to have see[n] or said they saw the Wilsons arriving home or Ms. Wilson leaving back out around 11 p.m.?" conveyed the answers by everyone he canvassed that they did not see the Wilsons coming home or going out around 11 p.m.[13] We need not decide the hearsay

---

13. Moreover, the detective's answer was elicited to cast doubt on appellant's alibi defense,

issue definitively, however. Assuming without deciding that the prosecutor's question to the detective elicited hearsay and that allowing the detective's answer was error, we can say with fair assurance that the (assumed) error was harmless.[14] To begin with, the fact that neighbors did not see the Wilsons coming home or Inga Wilson going out around 11 p.m. was, at best, weak proof that appellant's account was untrue, since neighbors may have been sleeping or simply may have never looked outside around the time in question. In contrast, there was ample, stronger evidence that, in the late hours of December 12 and the early morning hours of December 13, 2003, appellant was not at or near his home in Upper Marlboro, Maryland as he told investigators he was. Renee Benjamin testified that appellant called her around 12 a.m. asking for a ride home from the District, and cell phone records placed appellant's phone in the District, near the location where Inga Wilson's body was found, and not in Upper Marlboro. Because this admissible evidence significantly undermined appellant's alibi, it is *"highly probably"* that [any] error [in allowing detective Blackwell's answer] did not contribute to the verdict." *Odemns,* 901 A.2d at 782 (citations removed).

## V.

■ We turn finally to appellant's argument that the evidence was insufficient to prove beyond a reasonable doubt that he killed Inga Wilson. Our review as to this issue is *de novo. Poole v. United*

*States,* 929 A.2d 413, 415 (D.C.2007); *United States v. Bamiduro,* 718 A.2d 547, 550 (D.C.1998). We "review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine the credibility, weigh the evidence, and draw justifiable inferences of fact, and drawing no distinction between direct and circumstantial evidence." *Timberlake v. United States,* 758 A.2d 978, 980 (D.C.2000). We will reverse only where there is no evidence upon which a reasonable juror can infer guilt beyond a reasonable doubt. *Id.* at 981.

■ In this case, there was an array of evidence from which the jury could reasonably infer, and could conclude beyond a reasonable doubt, that appellant murdered his wife. Approximately a week before his wife was killed, appellant falsely told Renee Benjamin that his wife had been in a car accident and was in the hospital with serious injuries, and on December 12, 2003, he told Benjamin that the family had decided to discontinue his wife's life support. In addition, less than a week before his wife was killed, appellant applied for an insurance policy on her life and listed himself as a beneficiary. From this evidence, the jury could infer that appellant had been planning and setting the stage for breaking the news of his wife's death. Further, appellant obtained a gun from Tracy Thompson just a week before his wife was killed, affording him a means to shoot his wife. When appellant was informed by the police that his wife had been killed, he threw the gun into the Patuxent

---

and was not "merely descriptive of the [police] investigation." *Gamble v. United States,* 901 A.2d 159, 170 (D.C.2006).

**14.** We review violations of the hearsay rule under the standard of *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *In re D.B.,* 947 A.2d 443, 446–47 (D.C.2008); *Odemns v. United States,*

901 A.2d 770, 781 (D.C.2006). Therefore, we will find reversible error "only if, after pondering all that happened, we cannot say, with fair assurance, that the judgment was not substantially swayed by the error." *In re D.B.,* 947 A.2d at 453 (internal quotation marks and citations omitted).

River. That evidence, plus the appellant's inconsistent accounts about the circumstances in which he had paid $100 to the woman who drove him to his home during the early morning hours of December 13, 2003, suggest that appellant was attempting to hide from police information about his activities around the time of his wife's death. All this evidence, in conjunction with Benjamin's testimony that contradicted appellant's claim that he was not in the District on the night of the murder and the cell phone records that placed appellant's phone, at 12:51 a.m. on December 13, near the street where Inga Wilson's body was found, provided a sufficient basis for the jury to conclude that appellant committed first-degree, premeditated murder. *Cf. Drake v. State,* 476 So.2d 210, 215–16 (Fla. Dist.Ct.App.1985) (holding that there was sufficient evidence to sustain jury's verdict that appellant was guilty of killing his wife where appellant was engaged in an extramarital affair, appellant told his lover that he had already divorced his wife, appellant was the beneficiary of his wife's recently acquired insurance policy, appellant was the last person to see decedent before she was attacked, and appellant's testimony was contradicted in many respects).

For the foregoing reasons, the judgment of conviction is

*Affirmed.*